**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| IN RE: GERBER PRODUCTS COMPANY HEAVY METALS BABY FOOD LITIGATION <br><br> ———————————————— <br><br> This Document Relates to ALL Cases | Master File No. 1:21-cv-00269 (MSN/JFA) <br><br> **REPRESENTATIVE CLASS ACTION COMPLAINT** |

Plaintiffs Deandra Bryant, Christopher Craig, Mayra Verduzco, Renee Bryan, Jennifer Gaetan, Vanessa Inoa, Charlotte Willoughby, Angelique Velez, Danielle Visconti, Jessica Moore, and Janice Wilson ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action suit for monetary relief, including damages and restitution, and declaratory and injunctive relief against Defendant Gerber Products Company ("Gerber" or "Defendant"). Plaintiffs allege the following based upon personal knowledge as to allegations regarding themselves, and as to all other allegations based on the investigation of their counsel and information and belief where stated:

I.     **NATURE OF THE ACTION**

1.     Plaintiffs bring this class action on behalf of themselves and all consumers,

including parents and caregivers, nationwide who bought Defendant's baby food products containing harmful heavy metals such as arsenic, lead, cadmium, and mercury ("Heavy Metals"). The products at issue include, but are not limited to, the following: Gerber Puffs (all flavors); Gerber Lil' Crunchies (all flavors); Gerber Yogurt Melts (all flavors); Gerber 1st Foods (all flavors); Gerber 2nd Foods (all flavors); Gerber Cereals (all types); Gerber Juices (all flavors); Gerber Arrowroot Biscuits; Gerber Teether Wheels (all flavors); Gerber Yogurt Blends (all flavors); Gerber Fruit & Veggie Melts (all types and flavors); Gerber Graduates Mealtime for Toddler (all flavors); and Gerber Diced Carrots Veggie Pick-Ups (referred to herein as "Gerber Baby Food Product(s)" or "Baby Food Product(s)").[1]

2.       Providing children healthy and appropriate nourishment is critical to their development. Numerous scientific studies conducted over the last several decades have confirmed that arsenic, lead, cadmium, and mercury are developmental neurotoxins that are harmful to a baby's developing brain and nervous system.

3.       Babies and children who consume Heavy Metals are at risk of suffering significant health problems, including a loss of intellectual capacity and behavioral problems such as attention-deficit/hyperactivity disorder ("ADHD"), among other things. Even the consumption of small amounts of Heavy Metals over time can increase the risk of bladder, lung and skin cancer, and Type 2 Diabetes. Moreover, medical professionals and scientists alike agree that early exposure to Heavy Metals can have long-term effects that are irreversible.

4.       Gerber manufactures, warrants, advertises, and sells its products as being suitable and safe for consumption by babies and young children. Each of the Gerber Baby Food Products

---

[1]Plaintiffs reserve the right to expand the list of Gerber products specifically identified herein as their investigation continues and after they have had an opportunity to conduct discovery.

has the famous "Gerber Baby" logo, as well as indications that the products are safe and appropriate for babies and young children. For example, the Gerber Puffs package touts that the product supports "brain development and learning ability." Similarly, Gerber's Rice Cereal packaging promotes its inclusion of iron as supporting "learning ability." Other Baby Food Product packages tout that the products are "made with real fruit" or "whole grains." Gerber's food packaging, when considered as a whole and from the perspective of a reasonable consumer, conveyed to parents and other consumers that the Gerber Baby Food Products are safe and suitable for consumption by babies and young children.

5.      But a February 4, 2021 report from the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, titled "Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury" ("Congressional Report"), revealed that some of the largest baby food manufacturers in an industry that generates over $50 billion annually in sales knowingly distributed and sold baby food containing harmful Heavy Metals. Gerber was identified as one of the companies knowingly selling baby foods with harmful Heavy Metals that are not safe for consumption by babies and young children. The Congressional Report criticized Gerber for burying its head in the sand and not testing all ingredients and finished products for Heavy Metals, and for rarely testing for mercury in its baby foods.

6.      Gerber knows that its customers trust the quality of its Baby Food Products and that these customers expect the products to be free of harmful toxins and contaminants such as Heavy Metals. Gerber is also aware that many consumers seek out and buy premium baby foods that contain high quality ingredients, free of toxins, contaminants, or chemicals, and that these consumers will pay more for baby foods that they believe possess these qualities.

7.      Gerber promises on its website that its Baby Food Products "meet the standards of the FDA" and that Gerber has "among the strictest standards in the world."[2] And Gerber tells parents that every jar of its baby food goes "through over 100 quality checks" with "5 different stages of safety and quality checks from farm to spoon."[3] Promoting the appearance of being concerned for and protective of the infants and young children that it targets, Gerber comforts consumers by touting its "Clean Field Farming™" and "marketing strategy," while stating that "[s]ome soil can have unnaturally high levels of … heavy metals which you don't want with our baby food," adding, "that's why we created requirements for growing our fruits and veggies" that are among "the strictest in the world," and that "our agriculture team knows exactly how to grow for babies."[4] These promises make it clear that Gerber knows that adequate testing and baby foods free of harmful Heavy Metals are important and material to reasonable consumers.

8.      But contrary to the uniform message Gerber conveyed on its Baby Food Product packaging—that the Gerber Baby Food Products were safe and suitable for consumption by babies and young children—Gerber did not adequately test, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products. As a result, Gerber sold Baby Food Products that contained or were at material risk of containing harmful Heavy Metals.

9.      Gerber has known for several years that its Baby Food Products routinely contain, or are at a material risk of containing, harmful Heavy Metals. Yet Gerber has failed to implement adequate testing to ensure that it does not sell products containing harmful Heavy Metals.

---

[2] *See* Gerber Quality & Safety FAQs, https://www.gerber.com/learning-center/quality-safety-faqs (last visited June 1, 2022).

[3] *Id.*

[4] *See* Gerber Clean Field Farming™: Big Standards for Tiny Tummies, https://www.gerber.com/big-standards-for-tiny-tummies (last visited June 1, 2022).

4

10. As alleged herein, Gerber's product packaging was false, deceptive, and misleading to reasonable consumers because Gerber failed to disclose material facts to parents and other consumers who buy the Gerber Baby Food Products to feed babies and young children. Knowing that its Gerber Baby Food Products contain or are at material risk of containing harmful Heavy Metals, and the adverse impacts that toxic Heavy Metals pose to the health and development of children, Gerber breached its duty to consumers by failing to disclose on its packaging any facts with respect to Heavy Metals that are material to the reasonable consumer.

11. Specifically, Gerber failed to disclose on its packaging that (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards. Plaintiffs and Class members would have sought alternative options and would not have purchased the Gerber Baby Food Products had the foregoing material facts been disclosed to them. Plaintiffs and Class members did not receive the benefit of their bargain and thus overpaid for the Gerber Baby Food Products.

12. Plaintiffs bring this action on behalf of themselves and all other similarly situated persons (defined below) for common law claims for fraud by omission and unjust enrichment, violations of state consumer protection statutes, and for breach of the implied warranty of merchantability. Plaintiffs seek all available monetary relief, including actual, statutory, and/or punitive damages and restitution, and declaratory and injunctive relief as prayed for below.

## II.   JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Class exceeds 100; and many members of the proposed Class are citizens of different states than the Defendant.

14.   This Court has personal jurisdiction over Defendant Gerber because Defendant regularly sells and markets the Baby Food Products in this District, and Defendant derives substantial revenue from such sales in Virginia, with the knowledge that the Baby Food Products are marketed and sold for use in this State.

15.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant transacts substantial business in this District and Defendant is headquartered in Arlington, Virginia.

## III.   THE PARTIES

### A.   Plaintiffs

16.   **Deandra Bryant** is a resident and citizen of California. Plaintiff Bryant has bought Gerber's Baby Food Products, including but not limited to: Gerber Puffs (Strawberry Apple, Banana, Apple Cinnamon, Peach, Organic Apple); Gerber Lil' Crunchies (Mild Cheddar, Veggie Dip, Apple Sweet Potato, Organic White Cheddar Broccoli); Gerber Yogurt Melts (Strawberry, Banana Vanilla); Gerber 2nd Foods (Sweet Potato, Carrot); Gerber cereals (Single Rice); Gerber's juices (Apple Prune Juice); Gerber Teether Wheels (Apple Harvest); Gerber Fruit & Veggie Melts; Gerber Graduates Mealtime for Toddler (Pasta Pick-Ups Chicken & Carrot Ravioli, Mashed Potatoes & Gravy with Roasted Chicken and a Side of Carrot); and Gerber 1st Foods (Carrot, Sweet Potato) from Amazon and retail stores, such as Safeway, Target, Walmart,

and FoodsCo in San Francisco, California. Plaintiff Bryant purchased these products frequently from approximately December 2020 through February 2021. Plaintiff Bryant reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

17.     If Plaintiff Bryant had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Bryant would not have bought any of the Baby Food Products. Plaintiff Bryant did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products Plaintiff Bryant would have been aware of them. Plaintiff Bryant would be willing to purchase Gerber Baby Food Products in the future if she could be certain that they do not contain (or have a material risk of containing) harmful Heavy Metals.

18.     **Christopher Craig** is a resident and citizen of California. Plaintiff Craig has bought Gerber's Baby Food Products, including Gerber Puffs (Strawberry Apple, Banana, Blueberry, Sweet Potato, Apple Cinnamon, Peach, Organic Cranberry Orange, Organic Apple); Gerber Yogurt Melts (Strawberry, Very Berry Blend, Truly Tropical Blend, Mixed Berries, Organic Banana Strawberry, Organic Red Berries); Gerber 2nd Foods (Banana, Sweet Potato, Carrot Pear Blackberry, Carrot Sweet Potato Pea, Chicken Rice Dinner, Turkey Rice Dinner); Gerber Teether Wheels (Apple Harvest) from Albertsons, CVS, Rite Aid, Ralph's, and Von's in Sunland, California. Plaintiff Craig purchased these products frequently from approximately

October 2018 through February 2021. Plaintiff Craig reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

19.     If Plaintiff Craig had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Craig would not have bought any of the Baby Food Products. Plaintiff Craig did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products Plaintiff Craig would have been aware of them. Plaintiff Craig would be willing to purchase Gerber Baby Food Products in the future if he could be certain that they do not contain (or have a material risk of containing) harmful Heavy Metals.

20.     **Mayra Verduzco** is a resident and citizen of California. Plaintiff Verduzco has bought Gerber's Baby Food Products, including but not limited to: Gerber Puffs (Sweet Potato, Banana); Gerber Lil' Crunchies (Mild Cheddar); and Gerber 2nd Foods from Target in Riverbank, California, and once or twice from Walmart in Modesto, California. Plaintiff Verduzco purchased these products monthly from approximately August 2019 through October 2019. Plaintiff Verduzco reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

21.     If Plaintiff Verduzco had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when

8

Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Verduzco would not have bought any of the Baby Food Products. Plaintiff Verduzco did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products Plaintiff Verduzco would have been aware of them. Plaintiff Verduzco would be willing to purchase Gerber Baby Food Products in the future if she could be certain that they do not contain (or have a material risk of containing) harmful Heavy Metals.

22.     **Renee Bryan** is a resident and citizen of Florida. Plaintiff Bryan has bought Gerber's Baby Food Products, including Gerber Puffs and Gerber 1st Foods from retail stores, such as Publix and Target in Port St. Lucie, Florida and Palm Bay, Florida. Plaintiff Bryan purchased these products frequently in or around October/November 2020. Plaintiff Bryan reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

23.     If Plaintiff Bryan had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Bryant would not have bought any of the Baby Food Products. Plaintiff Bryan did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products Plaintiff Bryan would have been aware of them.

24.     **Jennifer Gaetan** is a resident and citizen of Florida. Plaintiff Gaetan has bought Gerber's Baby Food Products, including but not limited to: Gerber Puffs (flavors include but not limited to: Banana, Sweet Potato, Apple); Gerber Lil' Crunchies (flavors include but not limited to: Organic White Cheddar Broccoli); Gerber Yogurt Melts (Mixed Berry); Gerber 2nd Foods (flavors include but not limited to: Green Bean, Banana, Sweet Potato); Gerber cereals; Gerber Yogurt Blends (flavors include but not limited to: Strawberry); Gerber Graduates Mealtime for Toddler; and Gerber 1st Foods from Publix and Target in Miami, Florida, and online through Amazon and Instacart. Plaintiff Gaetan purchased these products frequently from approximately August 2019 through September 2020. Plaintiff Gaetan reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

25.     If Plaintiff Gaetan had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Gaetan would not have bought any of the Baby Food Products. Plaintiff Gaetan did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products Plaintiff Gaetan would have been aware of them. Plaintiff Gaetan would be willing to purchase Gerber Baby Food Products in the future if she could be certain that they do not contain (or have a material risk of containing) harmful Heavy Metals.

26.     **Vanessa Inoa** is a resident and citizen of Florida. Plaintiff Inoa has bought Gerber's Baby Food Products, including but not limited to: Gerber Puffs (Banana, Blueberry); Gerber Lil'

Crunchies (Garden Tomato, Mild Cheddar); Gerber 2nd Foods (flavors include but not limited to: Banana, Sweet Potato, Carrot, Apple, Butternut Squash, Green Bean); Gerber cereals (Single Grain Rice, Oatmeal Single Grain); Gerber Arrowroot Biscuits; Gerber Teether Wheels; and Gerber 1st Foods (flavors include but not limited to: Carrot, Sweet Potato) from Publix, Target, and Walmart in Kissimmee, Florida. Plaintiff Inoa purchased Gerber Arrowroot Biscuits and Gerber Teether Wheels only once in around April 2020; purchased Gerber Puffs and Gerber Lil' Crunchies frequently from approximately April 2020 through February 2021; purchased Gerber 2nd Foods and Gerber 1st Foods frequently from approximately September 2019 through February 2021; and purchased Gerber cereals frequently from approximately August 2019 through February 2021. Plaintiff Inoa reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

27.    If Plaintiff Inoa had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Inoa would not have bought any of the Baby Food Products. Plaintiff Inoa did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products Plaintiff Inoa would have been aware of them.

28.    **Charlotte Willoughby** is a resident and citizen of Illinois. Plaintiff Willoughby has bought Gerber's Baby Food Products, including but not limited to: Gerber cereals (flavors include but are not limited to: Rice, MultiGrain, Whole Wheat); Gerber 1st Foods (flavors include but are

11

not limited to: Sweet Potato, Carrot); Gerber 2nd Foods (flavors include but are not limited to: Banana, Sweet Potato, Apple, Butternut Squash, Green Beans, Carrot, Peach, Carrot Sweet Potato Pea, Chicken Rice Dinner, Turkey Rice Dinner); Gerber Lil' Crunchies (Mild Cheddar, Veggie Dip, Garden Tomato, Apple Sweet Potato, Ranch, Vanilla Maple); Gerber Puffs (flavors include but are not limited to: Strawberry Apple, Banana, Blueberry, Sweet Potato); Gerber Yogurt Melts (flavors include but are not limited to: Strawberry, Mixed Berries, Banana Vanilla, Peach); Gerber Fruit & Veggie Melts (flavors include but are not limited to: Truly Tropical Blend); Gerber Arrowroot Biscuits; Gerber Teether Wheels (flavors include but are not limited to: Apple Harvest); and Gerber Yogurt Blends (flavors include but are not limited to: Strawberry) from Target, Walmart, and Jewel Osco in Palatine, Illinois; Crown Point, Indiana; Whiting, Indiana; Hammond, Indiana; Merrillville, Indiana; from Meijer's in Rolling Meadows, Illinois; and from Strack & Van Til in Indiana. Plaintiff Willoughby purchased these products frequently from approximately July 2019 through December 2020. Plaintiff Willoughby reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

29.    If Plaintiff Willoughby had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Willoughby would not have bought any of the Baby Food Products. Plaintiff Willoughby did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products Plaintiff Willoughby would have been aware of them. Plaintiff Willoughby would be willing to

purchase Gerber Baby Food Products in the future if she could be certain that they do not contain (or have a material risk of containing) harmful Heavy Metals.

30.     **Angelique Velez** is a resident and citizen of New York. Plaintiff Velez has bought Gerber's Baby Food Products, including but not limited to: Gerber 1st Foods (Carrot, Sweet Potato); Gerber Arrowroot Biscuits; Gerber Yogurt Melts (Truly Tropical Blend, Organic Banana Strawberry); and Gerber Lil' Crunchies (Mild Cheddar, Garden Tomato, Apple Sweet Potato, Vanilla Maple) from Fort Hamilton Commissary in Brooklyn, New York and Market Fresh Supermarket in Staten Island, New York. Plaintiff Velez purchased these products frequently from approximately August 2020 through early February 2021. Plaintiff Velez reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

31.     If Plaintiff Velez had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Velez would not have bought any of the Baby Food Products. Plaintiff Velez did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products, Plaintiff Velez would have been aware of them.

32.     **Danielle Visconti** is a resident and citizen of New York. Plaintiff Visconti has bought Gerber Baby Food Products, including but not limited to: Gerber 1st Foods (Carrot, Sweet Potato); Gerber Graduates Mealtime for Toddler; Gerber Fruit & Veggie Melts; Gerber Yogurt

Blends; Gerber Teething Wheels; Gerber Cereals (Oatmeal, Single Rice); Gerber Lil' Crunchies (Cheddar); Gerber Puffs (Strawberry); Gerber Natural 2nd Foods (Sweet Potato); Gerber Mealtime Pick Ups (Chicken & Carrot Ravioli); and Gerber Apple Juice from DeCicco & Sons, Stop & Shop, BuyBuyBaby, and Instacart in Westchester County, New York. Plaintiff Visconti purchased these products frequently during 2020. Plaintiff Visconti reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

33.     If Plaintiff Visconti had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Visconti would not have bought any of the Baby Food Products. Plaintiff Visconti did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products, Plaintiff Visconti would have been aware of them. Plaintiff Visconti would be willing to purchase Gerber Baby Food Products in the future if she could be certain that they do not contain (or have a material risk of containing) harmful Heavy Metals.

34.     **Jessica Moore** is a resident and citizen of Texas. Plaintiff Moore has bought Gerber's Baby Food Products, including Gerber Puffs; Gerber Lil' Crunchies; Gerber Yogurt Melts; and Gerber Cereals (Oatmeal, Rice) from Kroger, Target, Walmart, and H-E-B in Houston, Texas. Plaintiff Moore purchased these products frequently in or about 2020.  Plaintiff Moore reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

14

35.     If Plaintiff Moore had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Moore would not have bought any of the Baby Food Products. Plaintiff Moore did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products Plaintiff Moore would have been aware of them. Plaintiff Moore would be willing to purchase Gerber Baby Food Products in the future if she could be certain that they do not contain (or have a material risk of containing) harmful Heavy Metals.

36.     **Janice Wilson** is a resident and citizen of Texas. Plaintiff Wilson has bought Gerber's Baby Food Products, including but not limited to, Gerber Puffs (Sweet Potato, Organic Fig Berry); Gerber Lil' Crunchies (Vanilla Maple, Apple Sweet Potato); Gerber Yogurt Melts (Very Berry Blend); Gerber 2nd Foods (Carrots, Green Bean, Sweet Potato, Peach, Apple); Gerber Cereals; Gerber Yogurt Blends; Gerber Fruit & Veggie Melts in Houston, Texas. Plaintiff Wilson purchased these products at HEB, Kroger, Brookshire Brothers, and Walmart in Houston, Texas and Richwood, Texas. Plaintiff Wilson purchased Gerber Puffs and Gerber Yogurt Melts frequently from approximately June 2020 through February 2021; purchased Gerber 2nd Foods and Gerber cereals frequently from approximately February 2020 through January 2021; purchased Gerber Yogurt Blends frequently from approximately May 2020 through February 2021; purchased Gerber Fruit & Veggie Melts frequently from approximately July 2020 through February 2021; and purchased Gerber Lil' Crunchies frequently from approximately August 2020

through February 2021. Plaintiff Wilson reviewed and relied on the packaging and believed the products to be safe, healthy, and suitable for babies and young children.

37.     If Plaintiff Wilson had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; or that when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiff Wilson would not have bought any of the Baby Food Products. Plaintiff Wilson did not receive the benefit of the bargain and thus overpaid. If Gerber had made these disclosures on the Baby Food Products, Plaintiff Wilson would have been aware of them.

### B.      Defendant

38.     Defendant Gerber Products Company is a citizen of Michigan, where it is incorporated, and Virginia because it maintains its principal place of business at 1812 N. Moore St., Arlington, Virginia 22209. Defendant's Baby Food Products are sold throughout the United States at large in brick-and-mortar stores and online retailers.

## IV.    FACTUAL ALLEGATIONS

### A.      Gerber is the Leading Manufacturer of Baby Food Products in the U.S.

39.     Gerber is an American manufacturer of baby food products. Gerber claims to be one of the "world's most trusted name[s] in baby food."[5]

---

[5] *See* Nestle Brands, https://www.nestle.com/brands/baby-foods/gerber. (last visited June 1, 2022).

16

40.     Gerber markets, advertises, promotes, and sells its Baby Food Products in all 50 states. Gerber claims its mission is to "give babies the best start in life."[6]

41.     Gerber controls a significant share of the United States market.  In 2018, the U.S. baby food market was valued at $12.9 billion in 2018 and is projected to grow to $17.2 billion by 2026 according to Allied Market Research.

**B.     Heavy Metals are Detrimental to Children's Health and Development**

42.     Arsenic, lead, cadmium, and mercury are toxic heavy metals. The U.S. Food and Drug Administration ("FDA") and the World Health Administration ("WHO") have declared arsenic, lead, cadmium, and mercury to be dangerous to human health, especially to babies and children.[7]

43.     According to the Congressional Report, "Children's exposure to toxic heavy metals causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior." The Congressional Report highlights numerous studies conducted over the last several decades analyzing the effects of early exposure to heavy metals and concluding that the harm is long-standing and irreversible.

44.     Babies and young children are particularly vulnerable to the effects from exposure to heavy metals because they are small, and their organs are developing. Specifically, exposure to heavy metals during childhood can lead to "untreatable and frequently permanent brain damage, which may result in reduced intelligence, as expressed in terms of lost IQ points, or disruption in

---

[6] *See* Gerber About Us, https://www.gerber.com/about-us (last visited June 1, 2022).

[7] U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (Feb. 4, 2021) ("Congressional Report") (https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last visited June 2, 2022), at page 2.

behavior."[8] Tom Neltner, chemical policy director for the Environmental Defense Fund ("EDF") which has studied lead in food for 25 years, states that "[e]xposure to these toxic heavy metals affects babies' brain development and nervous system, it affects their behavior, permanently decreases IQ, and, if you want to boil it down to dollars, their lifetime earnings potential."

45.     According to an October 2019 report by Healthy Babies Bright Futures (the "HBBF Report") reliable and recent research confirms that widespread exposure to foods with arsenic, lead, cadmium, and mercury can lead to troubling risks, including IQ loss, attention deficits, and other learning and behavioral impacts among children. Further, "[t]hree of the metals, arsenic, lead and cadmium, are also potent human carcinogens."[9] The HBBF Report further informs that "widespread exposure to toxic heavy metals shifts the population wide IQ curve down ... ratchets down the IQ of the most creative and intellectually gifted children," adding that "for an individual child, the harm appears to be permanent."[10] James Dickerson, Ph.D., Chief Scientific Officer for Consumer Reports, has opined that "[e]xposure to heavy metals has a disproportionate adverse effect on developing minds and bodies."

46.     A published study titled, *A Strategy for Comparing the Contributions of Environmental Chemicals and Other Risk Factors to Neurodevelopment of Children*, found that exposure to heavy metals such as lead are "associated with 40,131,518 total IQ point loss in 25.5

---

[8] Congressional Report at 9 (internal quotations omitted).

[9] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019)
(https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf)

[10] *Id.*

million children (or roughly 1.57 lost IQ points per child)—more than the total IQ losses associated with preterm birth (34,031,025), brain tumors (37,288) and traumatic brain injury (5,827,300) combined."[11]

47.     The FDA has concluded that arsenic, lead, cadmium, and mercury are hazardous to babies and children, have "no established health benefit," and "lead to illness, impairment, and in high doses, death." Even low levels of these heavy metals are concerning to health and well-being.

*1.     Arsenic*

48.     Arsenic is an odorless and tasteless element that does not degrade or disappear. Arsenic is highly toxic and a known cause of human cancers. Exposure to arsenic can cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, and damage to children's central nervous systems and cognitive development.[12]

49.     The consumption of arsenic can also result in serious and life-threatening health problems. The Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") has ranked arsenic as the number one substance present in the environment that poses the most significant threat to human health. The known health risks resulting from arsenic exposure include "respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[13]

50.     Arsenic is a baby food contaminant that has also been linked to bladder, lung and

---

[11] Congressional Report at 9.

[12] *Id.* at 10 (emphasis removed).

[13] *Id.*

skin cancer, and adverse effects on nervous systems, in our nation's youth. Arsenic also targets the developing brain. At least 13 peer reviewed scientific studies link arsenic to IQ loss for children exposed *in utero* or during the first few years of life.[14] Studies have found that there are lasting impacts on children that are exposed to arsenic early in their lives. Adverse impacts include persistent cognitive deficits and neurological problems.[15] One study of schoolchildren in Maine who drank water with an arsenic concentration level of more than 5 parts per billion ("ppb") showed significant decreases, in "Full Scale IQ, Working Memory, Perceptual Reasoning and Verbal Comprehension scores."[16]

      51.     According to the Congressional Report, "[t]here is no established safe level of arsenic consumption for babies"[17] and there is no scientific evidence that the adverse effects that

---

[14] *Id.*

[15] Gail A. Wasserman, et al., *Water Arsenic Exposure and Intellectual Function In 6-Year-Old Children In Araihazar, Bangladesh*, Environmental Health Perspectives (Feb. 2007) (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1817715/pdf/ehp0115-000285.pdf) (last visited June 2, 2022); Gail A. Wasserman, et al., *Child Intelligence and Reductions in Water Arsenic and Manganese: A Two-Year Follow-up Study in Bangladesh*, Environmental Health Perspectives (July 2016) (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4937860/pdf/ehp.1509974.pdf) (last visited June 2, 2022); JD Hamadani, et al., *Critical windows of exposure for arsenic-associated impairment of cognitive function in pre-school girls and boys: a population-based cohort study*, International Journal of Epidemiology (Dec. 2011) (https://academic.oup.com/ije/article/40/6/1593/804088?login=false) (last visited June 2, 2022); Hideo Tanaka, et al., *Long-term prospective study of 6104 survivors of arsenic poisoning during infancy due to contaminated milk powder in 1955*, J Epidemiol (Aug. 2010) (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3900820/pdf/je-20-439.pdf) (last visited June 2, 2022).

[16] Gail A. Wasserman, et al., *A Cross-Sectional Study of Well Water Arsenic and Child IQ in Maine Schoolchildren* (Apr. 1, 2014) (https://ehjournal.biomedcentral.com/articles/10.1186/1476-069X-13-23) (last visited June 1, 2022).

[17] Congressional Report at 51.

are caused by arsenic are reversible. Consumer advocacy groups like Healthy Babies Bright Futures has advocated that there should be no measurable amount of arsenic in baby food, while Consumer Reports has advocated for a limit of 3 ppb.

52.     Because of the risks associated with exposure to arsenic, the FDA has set a maximum level of arsenic at 10 ppb for drinking water. The Environmental Protection Agency ("EPA") and the WHO have set a similar limit.  While the FDA has set a limit of 100 ppb of inorganic arsenic for infant rice cereal, it did so because it was focused on the level of arsenic that would cause cancer, but "disregarded the risk of neurological damage, which happens at a much lower level."[18] Thus, according to the Subcommittee's Congressional Report, "the 100 ppb limit is too high to adequately protect infants and children from the effects of inorganic arsenic."[19]

### 2.      Lead

53.      According to the FDA, lead has no established health benefit. Lead is the second substance, after arsenic, on the ATSDR's list of substances present in the environment potentially posing a significant threat to human health. The consumption of even low levels of lead from food and other sources has been found to contribute to 400,000 deaths every year.

54.     The EPA, the Centers for Disease Control and Prevention ("CDC") and the American Academy of Pediatrics ("AAP") unanimously agree that there is no established "safe level of lead . . . in a child's blood; even low levels of [lead] in the blood can result in behavior and learning problems, lower IQ and hyperactivity, slowed growth, hearing problems, and

---

[18] Congressional Report at 52.

[19] *Id.*

anemia."[20] Consistent with this assessment, the AAP and the EDF have proposed a maximum of 1 ppb of lead in food for babies and children.[21]

55.     The FDA has established a maximum daily intake of lead from food (called the Interim Reference Level) of 3 μg (or 3 ppb) for kids and 12.5 μg (or 12.5 ppb) for women of childbearing age. The consumer organization Healthy Babies Bright Futures has advocated for a standard of zero lead in baby food while Consumer Reports advocates for no more than 1 ppb of lead in foods and drinks for babies and children.

56.     Outside the food context, the FDA has set a maximum limit on lead of 5 ppb for bottled water. The EPA has set an action level of 15 ppb of lead for drinking water while the WHO has set 10 ppb as a provisional guideline.

57.     Jay Schneider, Ph.D., Professor of Anatomy, Pathology and Cell Biology at Thomas Jefferson University, Philadelphia, Pennsylvania, has examined hundreds of children who have suffered the effects of lead exposure and believes that even the tiniest amounts of lead in children's food should be avoided. Dr. Schneider adds that "we know that there is no level of lead in the blood of a child that is safe" and that "no amount of heavy metals such as lead can be considered safe."

58.     Studies have shown that even low levels of lead exposure can have a negative impact on children. Lead is persistent, and it can bioaccumulate in the body over time.[22] In two

---

[20] Valerie Zartarian, et al., *Children's Lead Exposure: A Multimedia Modeling Analysis to Guide Public Health Decision-Making* (Sept. 12, 2017) (https://ehp.niehs.nih.gov/doi/10.1289/ehp1605) (last visited June 1, 2022).

[21] Congressional Report at 21.

[22]*See* https://www.espa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water (last visited June 1, 2022).

different studies of schoolchildren in Detroit and Chicago public schools, a significant inverse relationship was found between lead exposure and test scores. The Detroit study found a strong correlation between early childhood lead exposure and reduced standardized test performance.[23] In the Chicago study, higher blood level concentrations were linked to lower reading and math scores in third-grade children, with a substantial 32% increase in failing reading and math.[24]

59.     Early childhood lead exposure can result in permanent cognitive effects, as one study showed. In that study, adults who had developmental delays associated with lead exposure continued to show cognitive deficits.[25]

60.     Several studies have also established a strong link between lead exposure and ADHD.[26]

### 3.     Cadmium

61.     The ATSDR identifies cadmium as number seven on its list of substances present in the environment that potentially poses a significant threat to human health. Cadmium, like arsenic, has been shown to affect a child's IQ level and the development of ADHD.

62.     Several federal and state agencies have regulated cadmium. Pursuant to Proposition

---

[23] Nanhua Zhang, et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence From Detroit Public Schools* (Mar. 2013) (https://pubmed.ncbi.nlm.nih.gov/23327265/) (last visited June 1, 2022).

[24] Anne Evens, et al., *The Impact of Low-Level Lead Toxicity on School Performance Among Children in the Chicago Public Schools: A Population-Based Retrospective Cohort Study* (Apr. 7, 2015) (https://ehjournal.biomedcentral.com/articles/10.1186/s12940-015-0008-9) (last visited June 1, 2022).

[25] Maitreyi Mazumdar, et al., *Low-Level Environmental Lead Exposure in Childhood and Adult Intellectual Function: A Follow-Up Study* (Mar. 30, 2011) (www.ncbi.nlm.nih.gov/pmc/articles/PMC3072933/) (last visited June 1, 2022).

[26] Gabriele Donzelli, et al., *The Association Between Lead and Attention-Deficit/Hyperactivity Disorder: A Systematic Review* (Jan. 29, 2019) (www.mdpi.com/1660-4601/16/3/382/htm) (last visited June 1, 2022).

65, California has identified cadmium as causing developmental and male reproductive toxicity and has set an oral Maximum Allowable Dose Level of 4.1 μg (or 4.1 ppb) per day.

63.     The FDA and EPA have set a maximum allowable limit of cadmium of 5 ppb in bottled water and drinking water. The WHO has set a maximum allowable limit of cadmium in drinking water at 3 ppb.

64.     Consumer groups have advocated for even stricter levels of cadmium in foods. For example, Healthy Babies Bright Futures has advocated that no measurable amount of cadmium should be in baby foods, while Consumer Reports has advocated for a limit of 1 ppb of cadmium in fruit juices.

65.     Cadmium has been linked in numerous scientific studies to neurotoxicity in children, and has been linked to cancer, kidney, bone, and heart damage. Studies by Harvard scientists have reported the tripling of the risk of learning disabilities and special education needs among children with higher cadmium exposure.[27] This contaminant, found in baby foods, has been found to cause harm even at low levels of exposure.

66.     A study examining the effect of cadmium exposure on children concluded that it negatively impacted Full Scale IQ, with a particular effect on boys. According to the 2018 study, boys "exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure."[28]

---

[27] Timothy Ciesielski, et al., *Cadmium Exposure and Neurodevelopmental Outcomes in U.S. Children*, Environmental Health Perspectives (May 2012) (https://ehp.niehs.nih.gov/doi/epdf/10.1289/ehp.1104152) (last visited June 2, 2022).

[28] Congressional Report at 12 (citing Klara Gustin, et al., *Cadmium Exposure and Cognitive Abilities and Behavior at 10 Years of Age: A Prospective Cohort Study* (Apr. 2018) (https://pubmed.ncbi.nlm.nih.gov/29459184/).

67.     Another 2018 study found a link between cadmium exposure and ADHD and concluded that ADHD was more prevalent among children with the high cadmium exposure as compared to the control group.[29]

    4.    *Mercury*

68.     Mercury is the number three substance on ATSDR's list of substances in the environment potentially posing a significant threat to human health. Mercury is a known toxin, and pre-natal exposure has been associated with affected neuro-development, a decreased IQ, and autistic behaviors. In 2015, scientists determined that there was a four-fold higher risk of IQ scores under 80 among school aged children exposed to high levels of mercury *in utero*. An IQ under 80 is the clinical cutoff for borderline intellectual disability.

69.     The impact of mercury exposure to humans and animals has been studied for years. As early as 1997, the EPA issued a report to Congress that detailed the health risks to humans and animals. Because of these risks and mercury's toxicity, both state and federal regulators have enacted regulations to protect humans and animals.

70.     Mercury contains an especially toxic form called "methyl mercury" that increases cardiovascular disease risk in adults and has been linked to poor performance on tests of vision, intelligence and memory for children exposed *in utero*. It has been well known among Gerber and other baby food manufacturers that a child's developing brain is particularly sensitive to mercury. Evidence derived from two mass poisonings and a major longitudinal study of lower exposures from seafood, among other research demonstrates that the developing brain is particularly sensitive to mercury.

---

[29] Min-Jing Lee, et al., *Heavy Metals' Effects on Susceptibility to Attention-Deficit/Hyperactivity Disorder: Implication of Lead, Cadmium, and Antimony* (June 10, 2018) (https://pubmed.ncbi.nlm.nih.gov/29890770/) (last visited June 1, 2022).

71.     As with arsenic, lead, and cadmium, Healthy Babies Bright Futures advocates for a goal of zero level of mercury in baby food. Outside the baby food context, the FDA has set a limit of 2 ppb of mercury in bottled water, while the EPA has set a limit of 2 ppb for drinking water.

72.     Mercury's effect on children's development has been studied in the context of a pregnant woman's exposure to mercury. Pre-natal "mercury exposure has been consistently associated with adverse subsequent neuro-development."[30]

73.     Each of the four Heavy Metals identified above — arsenic, lead, cadmium, and mercury — has been known by Gerber to be toxic. Despite knowledge of their toxicity and potential adverse impact on babies and children, Gerber has failed to establish sufficient quality control mechanisms with respect to Heavy Metals to ensure the safety of the Gerber Baby Food Products. Gerber's general policy is to test only some ingredients, and not its final products or for all Heavy Metals. Finished baby foods are more toxic than their ingredients alone. According to the Congressional Report, these practices recklessly endanger babies and young children and prevents Gerber from ever knowing the full extent of the danger presented by its products.

74.     Nothing could be more important to a parent's decision on what baby food to purchase than whether the product is safe and healthy for their child, and Gerber knows this. Brian Ronhom, Director of Food Policy with Consumer Reports, states that "the last thing parents expect to find in baby food are toxic heavy metals like arsenic and lead that can threaten their child's health and wellbeing." However, Gerber has failed to protect vulnerable infants and toddlers from dangerous Heavy Metals.

---

[30] Margaret R. Karagas, et al., *Evidence on the Human Health Effects of Low-Level Methylmercury Exposure* (June 1, 2012) (https://pubmed.ncbi.nlm.nih.gov/22275730/) (last visited June 1, 2022).

75.     Gerber has failed to disclose to consumer on its packaging that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

     **C.**      **The Gerber Baby Food Products**

          *1.*    *Gerber Represents Itself as a Purveyor of Safe and Healthy Baby Foods*

76.     Gerber manufactures, distributes, and sells food for babies and young children and offers of a wide variety of food products such as traditional baby food purees, baby cereals, puffs, and rice cakes, among other products. To gain the trust of the consuming public, and because it knows these issues are of the utmost importance to consumers, Gerber holds itself out as a company that cares about the health of babies and kids and the foods they eat. Gerber knows that parents are very concerned about the foods they feed their children and thus seek foods that are safe and healthy for babies and young children. According to its website,[31] Gerber promises parents that "100% of our products meet all FDA requirements." Gerber claims to do "[o]ver 100 quality checks in every jar" throughout "5 different stages of safety and quality checks from farm to spoon," and promises that "[t]he health and safety of your little one has been and will always be our highest priority," adding that "on top of that Gerber follows an annual testing plan featuring regular safety tests of finished products," leading consumers to believe the products are rigorously

---

[31] Gerber Quality & Safety FAQs, https://gerberorganicfood.com/my/article/quality-safety-faqs/ (last visited June 3, 2022).

tested for any and all toxins and contaminants.[32] Gerber claims its standards are "the strictest in not just the U.S., but in the world."[33]

77.     Again acknowledging that Heavy Metals are an important issue for consumers, Gerber also touts on its website that its ingredients are safe and free of Heavy Metals. On its Quality & Safety FAQs page, Gerber states, "At Gerber, our farmers are using best in class practices to ensure quality ingredients and minimize the presence of any unwanted heavy metals." Gerber claims that its farmers "reduce the presence of [Heavy Metals] by: using best in class practices like soil testing, rotating crops, and choosing peak harvest times."[34]

78.     In addition, Gerber's "Clean Field Farming™" marketing strategy, in use since at least 2019, seeks to showcase Gerber's purported focus on providing safe foods for babies and toddlers. For example, Gerber asserts that it was "Keeping Soil in the Family," stating that "[s]ome soil can have naturally high levels of nitrates and heavy metals which you don't want in your baby's food. That's why we created requirements for growing our fruits and veggies" that are among the strictest in the world.[35] Gerber assured consumers that "[w]e know where every fruit and veggie is grown" and that "[o]ur agriculture team knows exactly how to grow for babies."

---

[32] *See* Gerber Quality & Safety FAQs, https://www.gerber.com/learning-center/quality-safety-faqs (last visited June 1, 2022).

[33] *Id.*

[34] *Id.*

[35]*See* Gerber Clean Field Farming™, www.gerber.com/clean-field-farming, archived at https://web.archive.org/web/20190616130535/https://www.gerber.com/clean-field-farming, on June 16, 2019.

Gerber's website contained these statements until at least September 27, 2020.[36]

79.     Even though Gerber made these statements to portray itself as a caring company and because it knew that consumers would find these issues important, in fact it did not conduct sufficient testing, or set internal standards, to ensure that its Baby Food Products were not sold on the market with harmful Heavy Metals. Nor did Gerber disclose these facts on its product packaging.

>     2.     *Gerber's Baby Food Product Packaging Conveys the Impression that the Foods are Safe and Suitable for Babies and Young Children*

80.     Defendant's product packaging uniformly conveys that its Baby Food Products are safe and suitable for consumption by babies and young children. Every package of a Gerber Baby Food Product features the famous "Gerber Baby" that the company is known for. This iconic logo is meant to and does convey that Gerber is a company that cares about the health and safety of children.

81.     In addition to the famous "Gerber Baby" on the product packaging, the packages also have other indications that convey the impression that the Baby Food Products are safe and suitable for babies and young children. For example, the Gerber Puffs package clearly depicts a crawling baby and indicates that the puffs are intended for "Crawler[s] 8+ months." Defendant also markets its Puffs as supporting "brain development and learning ability." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Gerber Puffs are safe and suitable for consumption by babies. But nowhere on its packaging does Gerber disclose to consumers that: (1) the product contains or was

---

[36]*See* Gerber Clean Farming™, www.gerber.com/clean-field-farming, archived at https://web.archive.org/web/20200927063937/https://www.gerber.com/clean-field-farming, on September 27, 2020.

at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

82.     The Gerber Puffs are sold in several flavors: Strawberry Apple, Banana, Blueberry, Sweet Potato, Vanilla, Apple Cinnamon, Peach, Organic Cranberry Orange, Organic Fig Berry, and Organic Apple Puffs.

83.     Below is an example of the front package of the Gerber Puffs product:



84.     Regarding the Gerber Lil' Crunchies, on the front of the packaging is the famous "Gerber Baby," and a depiction of a crawling baby with words stating that the product is for "Crawler[s] 8+ months." The packaging also touts the fact that the Lil' Crunchies are "Baked with Whole Grains." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber Lil' Crunchies are safe and suitable for consumption by babies. But nowhere on its packaging does Gerber disclose to consumers that: (1) the product contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

85.     The Gerber Lil' Crunchies are sold in several flavors, including: Mild Cheddar, Veggie Dip, Garden Tomato, Apple Sweet Potato, Ranch, Vanilla Maple, Organic White Cheddar Broccoli, and Organic White Bean Hummus.

86.     Below are examples of the front package of the Gerber Lil' Crunchies product:



87.     Gerber's Yogurt Melts products also depict the famous "Gerber Baby," as well as a depiction of a crawling baby, and indicate that the Gerber Yogurt Melts are intended for "Crawler[s] 8+ months." The packaging also touts the fact that the Gerber Yogurt Melts are "made with real fruit." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber Yogurt Melts are safe and suitable for consumption by babies. But nowhere on its packaging does Gerber disclose to consumers that: (1) the product contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

88.     The Gerber Yogurt Melts are sold in several flavors, including: Strawberry, Very

Berry Blend, Truly Tropical Blend, Mixed Berries, Banana Vanilla, Peach, Organic Banana

Strawberry, and Organic Red Berries.

89.     Below are examples of the front package of the Gerber Yogurt Melts product:



90.     Gerber's 1st Foods are purees that depict the famous "Gerber Baby," depict a baby

who is able to sit with support, and indicate that 1st Foods are intended for "Supported Sitters."

Defendant's statements, taken together and considered as a whole, from the perspective of a

reasonable consumer, convey that the Gerber 1st Foods are safe and suitable for consumption by

babies. But nowhere on its packaging does Gerber disclose to consumers that: (1) the product

contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately

tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished

products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby

Food Products with Heavy Metals in amounts that could cause harm to babies and children and at

times, the Baby Food Products have failed to meet even those internal standards.

91.    The Gerber 1st Foods are sold in several flavors, including: Banana, Sweet Potato,

Carrot, Green Bean, Apple, and Butternut Squash, among others. Below is an example of the front

package of the Gerber 1st Foods product:



92.    Gerber's 2nd Foods are purees that also depict the famous "Gerber Baby," depict a

sitting baby, and indicate that the 2nd Foods are intended for a "Sitter." Defendant's statements,

taken together and considered as a whole, from the perspective of a reasonable consumer, convey

that the Gerber 2nd Foods are safe and suitable for consumption by babies. But nowhere on its

packaging does Gerber disclose to consumers that: (1) the product contains or was at material risk

of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy

Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set

internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards. The Gerber 2nd Foods are sold in several flavors, including: Banana, Sweet Potato, Carrot, Green Bean, Apple, and Butternut Squash, among others. Below is an example of the front packaging of the Gerber 2nd Foods product:



93.     Gerber Cereals also depict the famous "Gerber Baby," a depiction of a baby, and indicate that the product is for "Supported Sitter" babies, "Sitters," or "Toddler 12+ months," depending on the product. Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber Cereals are safe and suitable for consumption by babies and toddlers. But nowhere on its packaging does Gerber disclose to consumers that: (1) the product contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies

and children and at times, the Baby Food Products have failed to meet even those internal standards.

94.     The Gerber Cereals include the Gerber Rice Cereal; Oatmeal; Single Grain Rice Cereal; Oatmeal Single Grain Cereal; MultiGrain Cereal; Apple Cinnamon Oatmeal & Barley Cereal; Oatmeal Banana Probiotic Cereal; Oatmeal Peach Apple Probiotic Cereal; Organic Oatmeal Banana Cereal; Organic Oatmeal Millet Quinoa Cereal; Banana Apple Strawberry Multigrain Cereal; Whole Wheat Apple Blueberry Cereal; Bananas & Cream Oatmeal & Barley Cereal; DHA & Probiotic Rice Cereal; Organic Oatmeal; Organic Single-Grain Rice Cereal; MultiGrain Cereal; Whole Wheat Cereal; Lil' Bits Oatmeal Banana Strawberry Cereal; Probiotic Oatmeal, Lentil, Carrots & Apples; Probiotic Oatmeal, Lentil, Carrots & Peas; My 1st Solids Starter Kit; Powerblend Probiotic Cereal Oatmeal Lentil Peach & Apple; and Powerblend Probiotic Oatmeal Chickpea Banana & Chia Cereal. Below is an example of the front package of a Gerber Cereal product:



95.     Regarding Gerber Juices, the packaging depicts the famous "Gerber Baby" as well as a depiction of a walking baby, and indicates that the product is for "Toddler[s] 12+months." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber Juices are safe and suitable for consumption by babies and toddlers. But nowhere on the packaging does Gerber disclose to consumers that: (1) the product contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

96.     The Gerber Juices are sold in the following varieties: 100% Apple Juice; 100% Pear Juice; Strawberry Kiwi Flavor Water & Fruit Juice; 100% Apple Prune Juice; and 100% White Grape Juice. Below is an example of the front package of a Gerber Juice product:



97.     Gerber's Arrowroot Biscuits are described as "Baby's First Biscuit" on the front of the packaging. The product depicts the famous "Gerber Baby," a depiction of a crawling baby, and

indicates that the food is for "Crawler[s] 10+months." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that Gerber's Arrowroot Biscuits are safe and suitable for consumption by babies. But nowhere on its packaging does Gerber disclose to consumers that: (1) the product contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

98.     Below is an example of the front package of the Gerber Arrowroot Biscuit product:



99.     Like Gerber's other Baby Food Products, the Gerber Teether Wheels have the famous "Gerber Baby" on the front of the package, a depiction of a crawling baby, and the words "Crawler 8+ months." Defendant's statements, taken together and considered as a whole, from the

perspective of a reasonable consumer, convey that Gerber's Teether Wheels are safe and suitable for consumption by babies. But nowhere on its packaging does Gerber disclose to consumers that: (1) the product contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

100.    The Teether Wheels are sold in two flavors: Apple Harvest and Banana Cream. Below is an example of the front package of the Gerber Teether Wheels:



101.    Gerber Yogurt Blends have the famous "Gerber Baby" on the front of the packaging, as well as a depiction of a crawling baby with the words "Crawler 8+ months" or depict a playing toddler with the words "Toddler 12+ months." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that Gerber

Yogurt Blends are safe and suitable for consumption by babies and toddlers. But nowhere on the packaging does Gerber disclose to consumers that: (1) the product contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.  Below is an example of the front package of the Gerber Yogurt Blends:



102.    The Gerber Fruit & Veggie Melts have the famous "Gerber Baby" on the front of the package, as well as a depiction of a crawling baby with the words "Crawler 8+ months." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Fruit & Veggie Melts are safe and suitable for consumption by babies. But nowhere on its packaging does Gerber disclose to consumers that: (1) the product contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished

products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

103.    The Fruit & Veggie Melts are sold in several flavors, including: Strawberry Yogurt Melts, Very Berry Blend Fruit & Veggie Melts, Mixed Berries Yogurt Melts, Banana Vanilla Yogurt Melts, Strawberry & Mixed Berries Yogurt Melts, Banana Strawberry Organic Yogurt Melts, and Red Berries Organic Yogurt Melts. Below is an example of the front package of the Gerber Fruit & Veggie Melts:



104.    The Gerber Graduates Mealtime for Toddler products have the famous "Gerber Baby" on the front of the package, as well as a depiction of a playful toddler with the words "Toddler 12+ months." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Graduates Mealtime for Toddler products are safe and suitable for consumption by toddlers. But nowhere on its packaging does

Gerber disclose to consumers that: (1) the product contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

105.    The Graduates Mealtime for Toddler products are sold in several flavors, including: Harvest Bowl Garden Tomato, Harvest Bowl Pesto, Harvest Bowl Spanish Style Sofrito, Pick-ups Chicken & Parmesan Cheese Ravioli, Pick-ups Chicken & Carrot Ravioli, and Mashed Potatoes & Gravy with Roasted Chicken and a Side of Carrots. Below is an example of the front package of a Mealtime for Toddler product:



106.    The Gerber Diced Carrots Pick-Ups have the famous "Gerber Baby" on the front

of the package, as well as a depiction of a crawling baby with the words "Crawler 10+ months." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Diced Carrots Pick-Ups are safe and suitable for consumption by babies. But nowhere on its packaging does Gerber disclose to consumers that: (1) the product contains or was at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards. Below is an example of the front package of the Diced Carrots Pick-Ups:



3.     *Congressional Investigations Published in 2021 Reveal that Gerber
Knowingly Sold Unsafe, Finished Baby Foods Containing Heavy Metals*

107.     On February 4, 2021, the United States House of Representatives Subcommittee on Economic and Consumer Policy (the "Subcommittee") published the Congressional Report, disclosing investigative findings that numerous commercial baby foods, including those manufactured by Gerber, were "tainted with significant levels of toxic heavy metals, including arsenic, lead, cadmium, and mercury."[37] Congressional investigators examined a wide range of baby foods including rice cereals, purees, puffs and juices. The Congressional Report found that organic products were as likely as conventional products to contain Heavy Metals.[38]

108.     According to the Congressional Report, Gerber sold finished baby food products, despite internal testing dated as early as 2017 showing that the products were unsafe because they contained ingredients with harmful levels heavy metals which are unsafe for babies and young children.

109.     For example, while Gerber did not provide the Subcommittee with arsenic results for all of its ingredients, Gerber provided the Subcommittee with internal test results showing that from 2017-2019, 67 batches of rice flour (an ingredient in many of the Baby Food Products) contained over 90 ppb of inorganic arsenic and certain batches tested as high as 98 ppb. These results are nearly 10 times more than the limit that the FDA has set for bottled water and that the EPA and WHO have set for drinking water. Moreover, the Congressional Report also indicated that Gerber failed to conduct testing of its finished baby food products for arsenic.

110.     Regarding lead, again, Gerber provided the Subcommittee with limited testing

---

[37]Congressional Report at 4.

[38] *See id.* at 9.

results. This limited testing from 2017-2019, however, was sufficient to show Gerber's disregard for the health and safety of babies and children and what the Subcommittee described as a "willingness to use ingredients that contained dangerous lead levels." Gerber's lead testing showed that ingredients such as sweet potatoes tested as high as 48 ppb lead. Twelve other batches of sweet potato tested at over 20 ppb lead. Other ingredients contained over 29 ppb lead, even though there is no amount of lead in a child's blood which is considered safe. Moreover, this is over 15 times the FDA's Interim Reference Level of 3 ppb of lead for food consumed by children. Again, Gerber provided no results regarding lead in its finished Gerber Baby Food Products.

111.    As to cadmium, Gerber's testing results from 2017-2019 showed that it used multiple batches of carrots containing as much as 87 ppb, far exceeding the 5 ppb cadmium allowed by the FDA and EPA for bottled and drinking water. Moreover 75% of the carrots Gerber used in its foods tested at more than 5 ppb cadmium. Gerber does not test all its ingredients for cadmium, and Gerber provided no results regarding cadmium in its finished Gerber Baby Food Products.

112.    As to mercury, Gerber has buried its head in the sand. According to the Subcommittee, Gerber rarely tested for mercury in its baby food products and then only in certain ingredients such as carrots, sweet potatoes, and lemon juice concentrate.

113.    As the above testing shows, from 2017 to 2019, and later, Gerber sold baby food products that had harmful Heavy Metals. Third-party testing has also shown that numerous Gerber Baby Food Products, including Gerber Puffs, Gerber Fruit & Veggie Melts, Gerber 1st and 2nd Foods, Gerber Arrowroot Biscuits, Gerber Teether Wheelers, Gerber Diced Carrots Veggie Pick-Ups, and Gerber Graduates Mealtime for Toddler, contained excessively high amounts of arsenic,

lead, cadmium and/or mercury.[39]

114.   The Congressional Report found that Gerber sold baby food products with ingredients that exceed the company's own internal standards for Heavy Metals.[40] For example, internal documents provided to the Subcommittee indicate that Gerber set an internal limit of 40 ppb for lead, but sold products that had 48 ppb lead.[41]   According to the Congressional Report, most baby food companies do not regularly test the products before they go to market, and even when they do, products with high levels of Heavy Metals are still sold.

115.   Representative Raja Krishnamoorthj, Chairman of the Subcommittee, told Consumer Reports that there are "dangerous levels of toxic metals in baby foods, and the levels far exceed what experts and governing bodies say is permissible. Left to their own devices, baby food makers have set testing standards in excess of what recommended standards are, and even then, they often violate their standards."

116.   The Congressional Report provides evidence that baby food companies such as Gerber are not doing enough to reduce risk from exposure to these Heavy Metals, and that phases of the manufacturing process, including the addition of vitamins and mineral mixes, may actually be contributing to the high levels of Heavy Metals in the Baby Food Products. The Congressional Report concluded that "[t]hese toxic heavy metals [in baby foods] pose serious health risks to babies and toddlers. Manufacturers knowingly sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever."[42]

---

[39] *See* HBBF Report.

[40] *See* Congressional Report at 33.

[41] *See* Congressional Report at 28.

[42] *Id.* at 59.

117.    On September 29, 2021, the Subcommittee issued a supplemental report ("Supplemental Report") to the February 21, 2021 Congressional Report concerning heavy metals found in baby foods manufactured and sold by Gerber and other U.S. manufacturers.[43] The Supplemental Report found that Gerber, and other baby food manufacturers, "consistently cut corners and put profit over the health of babies and children."

118.    The Supplemental Report was based in large part on testing of certain baby foods conducted by the State of Alaska's Department of Environmental Health Laboratory (hereafter "Alaska") through a cooperative agreement program to "strengthen the FDA's efforts to minimize foodborne exposure."[44] Alaska was awarded a grant through the program for purposes of testing inorganic arsenic levels in infant rice cereal and to determine whether the levels of inorganic arsenic in those products complied with the FDA's 100 ppb standard.[45] Alaska collected infant rice cereal samples taken randomly from customer shelves at various retail locations around Anchorage, Alaska in March and April 2021, which were tested in May 2021. Alaska reported the test results to Gerber, another manufacturer (Beech-Nut), and the FDA in May 2021.[46] The FDA reviewed Alaska's testing results, confirmed that Alaska's methods were sound, and that the data

---

[43] *See* "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods," Staff Report, U.S. House of Representatives, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, Sept. 29, 2021 (accessible at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/ECP%20Second%20Baby%20Food%20Report%209.29.21%20FINAL.pdf) (last visited June 1, 2022).

[44] *Id.* at 5.

[45] *See id.*

[46] *See id.*

supported a food safety violation.[47]

119. The Supplemental Report made a number of significant findings concerning Gerber's infant rice cereal products, including that the Alaska test results "*reveal dangerous levels of toxic inorganic arsenic … in Gerber infant rice cereal products*. … Gerber, despite its products' having similar inorganic arsenic levels to those of the Beech-Nut products, failed to take any action."[48] Specifically with respect to Gerber, its rice cereals "tested up to 116 ppb inorganic arsenic," which is even higher than the amount contained in Beech-Nut's average rice cereal product. While Beech-Nut recalled some of its products and completely discontinued sales of its rice cereal, *Gerber has taken no such actions to protect consumers*."[49] The Supplemental Report castigated Gerber for continuing to sell its rice cereal with nearly identical inorganic arsenic levels to Beech-Nut's rice cereal, instead of issuing a recall like Beech-Nut did.

120. The Supplemental Report also found that the processes by which most baby food manufacturers test their products for Heavy Metals are flawed. Rather than testing finished products, they test individual ingredients which can underestimate the levels of toxic heavy metals in their products.[50]

121. As the leading manufacturer of baby food in the United States, Gerber has been fully aware at all material times that exposure to even small amounts of Heavy Metals may, over time, negatively impact babies and young children by increasing the risk of several serious health

---

[47] *See id.*

[48] *Id.* at 3 (emphasis added).

[49] *Id.* (emphasis added).

[50] *See* Supplemental Report at 3.

48

problems, including those involving carcinogenic, cognitive, and reproductive effects. Babies and young children are the most at risk, particularly given the potential harm of Heavy Metals exposure on developing brains in the form of lower IQ and behavior problems.

122.    Despite touting itself as a family company that cares about babies and children and aims to provide nutritious and healthy foods, and conveying through statements on product packaging that the Gerber Baby Food Products are safe and suitable for babies and young children, Gerber knowingly sold Baby Food Products that were unsafe for babies and children and failed to disclose material facts to consumers, including: that (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

123.    The FDA, through its Closer to Zero Initiative ("Action Plan"), is reviewing the levels of Heavy Metals in baby foods and considering action levels for certain toxic elements as appropriate. The FDA states that it has "prioritized babies and young children because their smaller body sizes and metabolism make them more vulnerable to the harmful effects of these contaminants."  However, any proposed action levels if adopted would only prohibit the placement of the baby foods in the market in the future – it would not require the disclosure of the presence of Heavy Metals on any label or packaging or apply retroactively.  Thus, the Action Plan does not address the basis of this lawsuit: the disclosure of Heavy Metals on the product packaging.  And if there is even final adoption of the Action Plan, the FDA set forth a generalized and long period of review which vaguely extends to "April 2024 and beyond."

4. *Gerber's Knowledge Predates the Congressional Reports*

124. Gerber was aware that its products were not safe well before the February 4, 2021 Congressional Report based on internal testing from 2017 that was produced to the Congressional Committee. Moreover, as a participant in the Baby Food Council ("BFC"), Gerber knew that ingredients it used in its baby food products contained Heavy Metals and that the inclusion of the Heavy Metals was a serious issue that needed to be addressed through proper testing and higher supplier standards.

125. The BFC was formed in 2019 with the goal to reduce heavy metals in baby foods to as low as possible or as low as reasonably achievable using best-in-class management practices.

126. Gerber participated in the BFC and initially agreed to provide information relating to heavy metals so that the baby food companies could develop standards which the companies would voluntarily adhere to. But Gerber never provided the originally agreed upon data.

127. During its engagement with the BFC, Gerber was put on notice in a May 17, 2020 email from Tom Neltner of the EDF that three carrot food types in the marketplace (puree, baby carrots, and fresh peeled and broiled carrots) had cadmium levels between 10 and 20 ppb; that lead was more commonly detected in baby food puree; and that arsenic is more commonly found in baby carrots.

128. On this same day, Gerber also received notice from Mr. Neltner that sweet potato puree and canned sweet potatoes on the market had lead levels above 10 ppb and that lead was detected in all of the samples except baked sweet potatoes with skins removed.

129. Members of the BFC, like Gerber, were also provided information on best practices for preventing Heavy Metal contamination, like focusing on getting ingredient suppliers to utilize certain testing laboratories that were identified as capable of accurately and consistently detecting

low levels of Heavy Metals in baby foods. Of specific concern to the BFC were sweet potatoes, carrots, and squash because those foods are commonly used in baby food products and often have detectable levels of lead and cadmium. The BFC also provided grants to universities to analyze data relating to ingredient testing and an employee of Gerber, Todd DeKryger, managed the connection between the universities and the BFC.

130.    Some of the information and best practices the BFC considered included a Louisiana State University project called "Sweet Potato Best Practices to Reduce Heavy Metals," that proposed the development of best practices as a way to help reduce the risk of heavy metal contamination in the sweet potato production and supply chains. The BFC also considered materials by Principal Investigator Rui Hai Lue at Cornell University called "Reduction of Heavy Metals in Infant and Toddler Foods, A proposal to the Baby Food Council."

131.    As part of its participation in the BFC, Gerber was also charged with review of the study of sweet potatoes and heavy metals.

132.    During BFC meetings, the parties also considered and discussed supply chain issues, including but not limited to specific issues relating to carrots and sweet potatoes. The BFC also developed a "Heavy Metal Questionnaire" to assist and assess ingredient suppliers on issues relating to heavy metals.

133.    As such, Gerber was armed with the knowledge that there were many steps it could and should take to decrease the presence of heavy metals in its baby foods, including (1) requiring suppliers to use additives in growing crops that reduce heavy metal uptake in the process; (2) choosing strains of foods known to be less prone to absorb heavy metals; (3) requiring testing of every ingredient received from a supplier and every lot of the baby foods; and (4) requiring audits of heavy metal testing results from all potential suppliers and testing of the soil where the product

is grown.

134.    Gerber's participation in the BFC makes it clear that Gerber knew that there were steps it could take with respect to its supply chain to minimize the presence of heavy metals through its participation in the BFC.

        5.    *Certain of Gerber's Competitors are Manufacturing Baby Food Without Measurable Levels of Heavy Metals*

135.    Certain of Gerber's competitors are manufacturing baby food products with little to no detectable levels of Heavy Metals.

136.    For example, the non-profit Clean Label Project tests products for more than 400 contaminants, including Heavy Metals, and presents its Purity Award to manufacturers whose products do not have measurable levels of Heavy Metals. Gerber competitors, such as Nature's One, Cerebelly, Bobbie, Else Nutrition, and Once Upon a Farm have all received such awards with respect to their products, including baby cereal, baby food purees, and infant and toddler formulas.

137.    That Gerber's competitors are able to produce foods without measurable levels of Heavy Metals shows that Gerber, the largest baby food manufacturer in the United States with the biggest market share, should be able to do the same.

### D.    PLAINTIFFS' RELIANCE IS REASONABLE AND WAS FORESEEABLE

138.    According to the Congressional Report:

The Subcommittee's investigation proves that commercial baby foods contain dangerous levels of arsenic, lead, mercury, and cadmium. These toxic heavy metals pose serious health risks to babies and toddlers. Manufacturers knowingly sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever.[51]

---

[51] Congressional Report at 59.

139.    Plaintiffs are reasonable consumers who do not have the scientific knowledge or wherewithal to independently determine that the Baby Food Products contained, or were at material risk of containing, harmful Heavy Metals or other undesirable toxins, or to ascertain the true nature of the ingredients in the Baby Food Products.  Therefore, reasonable consumers must and do rely on baby food manufacturers like Gerber to provide them with accurate information as to what their baby food products contain.  This is particularly true with respect to whether a food product intended for babies and young children contains or is at material risk of containing arsenic, lead, cadmium, and mercury.  Facts pertaining to the presence of arsenic, lead, cadmium, and mercury in food products for babies and young children are material to reasonable consumers due to the healthy and developmental problems that can arise from consumption as detailed herein.

140.    As Subcommittee Chairman Krishnamoorthi stated:

Baby food manufacturers hold a special position of public trust. Consumers believe that they would not sell unsafe products. Consumers also believe that the federal government would not knowingly permit the sale of unsafe baby food. As this staff report reveals, baby food manufacturers and federal regulators have broken the faith.[52]

141.    No reasonable consumer would knowingly purchase the Gerber Baby Food Products if they knew they contained or were at material risk of containing harmful Heavy Metals, and their reliance on Gerber's statements and/or omissions is not required given the nature of the product defects and safety risks. Alternatively, Plaintiffs and members of the Class are presumed to, or did, reasonably rely on Gerber's product packaging claims, warranties, omissions, advertisements, and other marketing concerning the qualities and benefits of the Baby Food Products in making their purchase decisions.

142.    Had Plaintiffs and members of the Class known that: (1) the Gerber Baby Food

---

[52] Congressional Report at 6.

Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards, Plaintiffs and members of the Class would not have purchased the Baby Food Products.

### E.     TOLLING OF THE STATUTE OF LIMITATIONS

#### 1.     *Discovery Rule Tolling*

143.    Within the period of any applicable statues of limitations, Plaintiffs and proposed Class members could not have discovered through the exercise of reasonable diligence that the Gerber Baby Food Products contained Heavy Metals and were unsafe for babies and young children to consume since they trusted Gerber and did not have access to, among other things, any internal testing that Gerber may have undertaken.

144.    Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Gerber's products contained Heavy Metals, or that Gerber's advertising, marketing, and product packaging was false and/or misleading.

145.    Plaintiffs and Class members could not have reasonably discovered the true extent of Gerber's deception with regard to the lack of safety of the Gerber Baby Food Products until the publication of the Congressional Report on February 4, 2021.

146.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule.

2.     *Fraudulent Concealment Tolling*

147.     All applicable statutes of limitation have also been tolled by Gerber's fraudulent concealment throughout the period relevant to this action of its own adverse internal testing and knowledge of dangerous levels of Heavy Metals in the Gerber Baby Food Products.

148.     Instead of disclosing to consumers that the Gerber Baby Food Products contained or were at material risk for containing harmful Heavy Metals as determined by its own internal testing, Gerber continued to manufacture and represent that the products were safe and suitable for young children while concealing material information from the Plaintiffs and Class members.

3.     *Estoppel*

149.     Gerber was under a continuous duty to disclose to Plaintiffs and the other Class members the risks of consuming the Gerber Baby Food Products.

150.     Gerber knowingly, affirmatively, and actively concealed or recklessly disregarded the true risks of consuming the Gerber Baby Food Products, and meanwhile led consumers to believe that they were safe for consumption by babies and young children.

151.     Accordingly, Gerber is estopped from relying on any statutes of limitations in defense of this action.

## V.     **CLASS ACTION ALLEGATIONS**

152.     Plaintiffs brings this action on behalf of themselves and a national Class initially defined as follows: All persons residing in the United States who purchased Gerber Baby Food Products for personal, family, or household use, and not for resale, within the applicable statute of limitations period (the "National Class").

153.     Plaintiffs Bryant, Craig, and Verduzco also bring this action on behalf of themselves and a California class initially defined as follows: All persons residing in California

who purchased for personal, family, or household use, from 2017 to the present, one or more Gerber Baby Food Products (the "California Class").

154.    Plaintiffs Bryan, Gaetan, and Inoa also bring this action on behalf of themselves and a Florida class initially defined as follows: All persons residing in Florida who purchased for personal, family, or household use, from 2017 to the present, one or more Gerber Baby Food Products (the "Florida Class").

155.    Plaintiff Willoughby also brings this action behalf of herself and an Illinois class initially defined as follows: All persons residing in Illinois who purchased for personal, family, or household use, from 2017 to the present, one or more Gerber Baby Food Products (the "Illinois Class").

156.    Plaintiffs Velez and Visconti also bring this action on behalf of themselves and a New York class initially defined as follows: All persons residing in New York who purchased for personal, family, or household use, from 2017 to the present, one or more Gerber Baby Food Products (the "New York Class").

157.    Plaintiffs Moore and Wilson also bring this action on behalf of themselves and a Texas class initially defined as follows: All persons residing in Texas who purchased for personal, family, or household use, from 2017 to the present, one or more Gerber Baby Food Products (the "Texas Class").

158.    The National Class and the State Classes are collectively referred to herein as the "Class" unless otherwise stated.

159.    Excluded from the proposed Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

160.    Plaintiffs reserve the right to re-define any of the Class definitions prior to class certification and after having the opportunity to conduct discovery.

161.    This action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

**A.      Numerosity of the Proposed Class (Fed. R. Civ. P. 23(a)(1))**

162.    The members of the Class are so numerous that their individual joinder would be impracticable. The Class comprises at least hundreds of thousands of consumers. The precise number of Class members, and their addresses, are unknown to Plaintiffs at this time, but can be ascertained from Defendant's records and/or retailer records. The members of the Class may be notified of the pendency of this action by mail or email, supplemented (if deemed necessary or appropriate by the Court) by published notice.

**B.      Predominance of Common Questions of Fact and Law (Fed. R. Civ. P.
          23(a)(2); 23(b)(3))**

163.    Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual members of the Class. The common legal and factual questions include, without limitation:

(a)      Whether Defendant knew its Baby Food Products contained, or were at risk of containing, harmful Heavy Metals;

(b)      Whether Defendant had a duty to disclose that: (1) its Baby Food Products contain, or are at material risk for containing, harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at

times, the Baby Food Products have failed to meet even those internal standards;

(c)     Whether Defendant failed to disclose material facts to Plaintiffs and Class members regarding its Baby Food Products, namely that: (1) its Baby Food Products contain, or are at material risk for containing, harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards;

(d)     Whether reasonable consumers were likely to be deceived by Defendant's failure to disclose material facts on the Baby Food Products' packaging;

(e)     Whether Defendant breached the implied warranty of merchantability;

(f)     Whether Defendant was unjustly enriched by the sale of the Baby Food Products;

(g)     Whether Defendant violated the state consumer protection statutes alleged herein;

(h)     Whether and how much Defendant's misconduct resulted in economic harm to Plaintiffs and the Class members; and

(i)     The nature of the relief, including damages and equitable relief, to which Plaintiffs and the members of the Class are entitled.

### C.  Typicality of Claims (Fed. R. Civ. P. 23(a)(3))

164.  Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all other Class members, purchased Defendant's Baby Food Products, suffered damages as a result of that purchase, and seek the same relief as the proposed Class members.

### D.  Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))

165.  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class, and they have retained counsel competent and experienced in complex class action and consumer litigation.

166.  Plaintiffs and their counsel will fairly and adequately protect the interest of the members of the Class.

### E.  Superiority of a Class Action (Fed. R. Civ. P. 23(b)(3))

167.  A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and members of the Class. There is no special interest in Class members individually controlling the prosecution of separate actions. The damages suffered by individual members of the Class, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. Further, it would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. And, even if members of the Class themselves could afford such individual litigation, the court system could not, given the thousands or even millions of cases that would need to be filed. Individualized litigation would also present a potential for inconsistent or contradictory judgments. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the

benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**F.      Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2))**

168.    In the alternative, this action may properly be maintained as a class action, because:

(a)      the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendant; or

(b)      the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c)      Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

**G.      Issue Certification (Fed. R. Civ. P. 23(c)(4))**

169.    In the alternative, the common questions of fact and law, set forth *supra*, are appropriate for issue certification on behalf of the proposed Class.

## VI.     <u>CAUSES OF ACTION</u>

**FIRST CAUSE OF ACTION**
**Breach of Implied Warranty**
**(On Behalf of Plaintiffs and the Class or, in the Alternative, the State Classes)**

170.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-169, as though fully set forth herein.

171.    Plaintiffs bring this claim individually and on behalf of the Class or, in the alternative, each Plaintiff brings this claim individually and on behalf of each state class he or she represents.

172.    At all relevant times, Gerber was the merchant, manufacturer, marketer, warrantor, and/or seller of the Baby Food Products.  Gerber knew or had reason to know of the specific use for which the Baby Food Products were purchased.

173.    Plaintiffs and the Class members are consumers who purchased the Baby Food Products manufactured and marketed by Gerber throughout the United States, as well as through Gerber's website directly.

174.    An implied warranty that the Baby Food Products were merchantable arose by operation of law as part of the sale of the Baby Food Products.

175.    Gerber impliedly warranted to Plaintiffs and the Class that the Baby Food Products were of merchantable quality and fit for their ordinary use and intended purpose, including that the food was nutritious and safe for consumption by infants and young children.  However, the Baby Food Products when sold at all times were not in merchantable condition and were and are not fit for the ordinary and intended purpose of providing safe and nutritious food for babies and children because Gerber failed to disclose material facts including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

176.    Plaintiffs and members of the Class relied on Defendant's skill and judgment and implied warranties when they purchased the Baby Food Products. However, contrary to such implied warranties, the Baby Food Products were not of merchantable quality or fit for their ordinary use and intended purpose, consumption by infants or young children, as they contained, or were at material risk of containing, Heavy Metals and/or other ingredients or contaminants.

177.    As a consequence, Gerber breached its implied warranties upon selling such Baby Food Products, as each product contained or materially risked containing Heavy Metals and/or other toxic ingredients or contaminants.

178.    Gerber cannot disclaim its implied warranty as it knowingly sold unsafe and hazardous Baby Food Products.

179.    Gerber had sufficient notice of its breach of implied warranties as it has, and had, exclusive knowledge of manufacturing processes, quality control policies, the physical and chemical make-up of the Baby Food Products, and whether the ingredients contained Heavy Metals.

180.    Gerber was also on notice as it was aware of the presence or material risk of the Heavy Metals in the Baby Food Products due to its own testing and/or expertise and based on the investigation in the HBBF Report that revealed the Baby Food Products as containing various toxic Heavy Metals. Additionally, prior to filing of this case, the Subcommittee requested internal documents and test results from Gerber as part of its investigation into the presence of Heavy Metals in baby foods. Finally, by letter dated March 12, 2021, Plaintiff Mayra Verduzco (California) provided pre-suit notice of the breach of warranty claims asserted herein to Defendant and by letter dated September 17, 2021, Plaintiff Renee Bryan (Florida) provided pre-suit notice of the breach of warranty claims asserted herein to Defendant.

181.    Gerber was also provided notice by the numerous class action complaints filed against it alleging similar claims. Affording Gerber further opportunity to cure its breach of implied warranties would be unnecessary and futile here because Gerber has known of and concealed the safety of its Baby Food Products.

182.    As a direct and proximate result of Gerber's breach of implied warranty, Plaintiffs and members of the Class have been damaged in an amount to be proven at trial.

183.    Plaintiffs and members of the Class have been excused from performance of any warranty obligations as a result of Gerber's conduct described herein.

184.    Privity exists because Gerber impliedly warranted to Plaintiffs and members of the Class through the packaging that the Baby Food Products were nutritious products safe for consumption by infants and young children, but these warranties were false by failing to make any mention of the presence or material risk of toxic Heavy Metals.

185.    Privity also exists as Gerber intended that the packaging and implied warranties would be considered by the end purchasers of the Baby Food Products, including Plaintiffs and the proposed Class members. Gerber directly marketed to Plaintiffs and the proposed Class through its product packaging and they were the intended beneficiaries of the implied warranties.

186.    As a direct and proximate result of Gerber's conduct, Plaintiffs and members of the Class have suffered damages in that they have purchased Baby Food Products that are worthless or worth less than the price they paid and that they would not have purchased at all had they known that: 1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could

cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

187.   Plaintiffs and members of the Class seek damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

**SECOND CAUSE OF ACTION**
**Fraudulent Concealment – Fraud by Omission**
**(On Behalf Plaintiffs and the Class or, in the Alternative, the State Classes)**

188.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1-169, as though fully set forth herein.

189.   Plaintiffs bring this claim individually and on behalf of the Class or, in the alternative, each Plaintiff brings this claim individually and on behalf of the state class he or she represents.

190.   Gerber failed to disclose material facts to Plaintiffs and the Class including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

191.   Gerber's packaging creating the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children was untrue or misleading in light of the foregoing material omissions.

192.   Gerber was under a duty to disclose to Plaintiffs and members of the Class the true quality, characteristics, ingredients and suitability of the Products because: (1) Gerber was in a

superior position to know the true state of facts about its Baby Food Products; (2) Gerber was in a superior position to know the actual ingredients, characteristics, and suitability of the Baby Food Products for consumption by babies and young children; (3) Gerber had exclusive knowledge of its own test results showing Heavy Metals or the material risk of same in its Baby Food Products; (4) Gerber knew that Plaintiffs and members of the Class could not reasonably have been expected to learn or discover that the Baby Food Products contained or materially risked containing Heavy Metals; (5) Gerber's packaging created the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children when it knew this was untrue or misleading in light of the foregoing material omissions; and/or (6) Gerber was in a special position of public trust as a manufacturer of baby foods.

193.    Gerber intentionally concealed the presence or material risk of Heavy Metals in the Baby Food Products with intent to defraud and deceive Plaintiffs and the Class.

194.    The facts concealed or not disclosed by Gerber to Plaintiffs and members of the Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products as described above.

195.    Gerber had the opportunity to disclose the material omissions on the Baby Food Products to Plaintiffs and the members of the Class.

196.    Gerber knew that its omissions were material information that Plaintiffs and the Class would have wanted to know and Gerber intentionally omitted and failed to disclose this information to induce Plaintiffs and the Class to purchase its Baby Food Products.

197.    Plaintiffs and the Class did not know or suspect that the Baby Food Products were unsafe or contained or materially risked containing Heavy Metals and could not have reasonably

discovered the truth about the presence or material risk of Heavy Metals in the Baby Food Products.

198.    Gerber intended that Plaintiffs and the Class rely on its omissions and Plaintiffs and the Class justifiably relied on Gerber's omissions to their detriment.  The detriment is evident from the true quality, characteristics, and ingredients of the Products.

199.    As a direct and proximate result of Gerber's conduct, Plaintiffs and members of the Class have suffered damages in that they purchased the Baby Food Products that were worthless or worth less than the price they paid and that they would not have purchased at all had they known of the material risk and/or presence of Heavy Metals and/or other toxic ingredients.

200.    Plaintiffs and members of the Class seek damages and punitive damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

## THIRD CAUSE OF ACTION
## Quasi Contract/Unjust Enrichment
### (On Behalf of Plaintiffs and the Class or, in the Alternative, the State Classes)

201.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-169, as though fully set forth herein.

202.    Plaintiffs bring this claim individually and on behalf of the Class or, in the alternative, each Plaintiff brings this claim individually and on behalf of the state class he or she represents.

203.    As alleged herein, Gerber failed to disclose material facts to Plaintiffs and the Class including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal

standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

204.    Gerber's packaging creating the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children was untrue or misleading in light of the foregoing material omissions.

205.    Plaintiffs and members of the Class reasonably relied on the material omissions, were unaware of the true facts regarding the Baby Food Products and have not received all of the benefits promised by Gerber.  Plaintiffs and members of the Class therefore have been induced by Gerber's material omissions about the Baby Food Products and paid more money to Gerber for the Products than they otherwise would and/or should have paid.

206.    Plaintiffs and members of the Class have conferred a benefit upon Defendant as Gerber has retained monies paid to them by Plaintiffs and members of the Class.

207.    The monies received were obtained under circumstances that were at the expense of Plaintiffs and members of the Class – *i.e.*, Plaintiffs and members of the Class did not receive the full value of the benefit conferred upon Gerber.

208.    Therefore, it is inequitable and unjust for Gerber to retain the profit, benefit, or compensation conferred upon it by Plaintiffs and the members of the Class.

209.    As a direct and proximate result of Gerber's unjust enrichment, Plaintiffs and members of the Class are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Gerber from its deceptive, misleading, and unlawful conduct as alleged herein.

**FOURTH CAUSE OF ACTION**

**Violations of California's Consumers Legal Remedies Act,**
**California Civil Code §§1750,** *et seq.***,**
**(On Behalf of Plaintiffs Christopher Craig, Deandra Bryant, and Mayra Verduzco and the**
**California Class)**

210.    Plaintiffs Christopher Craig, Deandra Bryant, and Mayra Verduzco (the "California Plaintiffs") repeat and reallege the allegations contained in paragraphs 1-169, as though fully set forth herein.

211.    The California Plaintiffs bring this claim individually and on behalf of the California Class.

212.    The California Plaintiffs and each proposed member of the California Class is a "consumer," as that term is defined in California Civil Code § 1761(d).

213.    The Baby Foods Products are "goods," as that term is defined in California Civil Code § 1761(a).

214.    Gerber is a "person" as that term is defined in California Civil Code § 1761(c).

215.    The California Plaintiffs and each California Class member's purchase of the Baby Food Products constituted a "transaction" as that term is defined in California Civil Code § 1761(e).

216.    As alleged herein, Gerber failed to disclose material facts to the California Plaintiffs and the California Class including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

217.     Gerber's packaging created the impression that the Baby Food Products are nutritious products that are safe and suitable for consumption by infants and young children that was untrue or misleading in light of the foregoing material omissions.

218.     Gerber's conduct alleged herein violates the following provisions of California's Consumers Legal Remedies Act (the "CLRA"): California Civil Code § 1770(a)(5), by representing that the Baby Food Products have characteristics, uses, and benefits that they do not have; California Civil Code § 1770(a)(7), by representing that the Baby Food Products are of a particular standard, quality, or grade, when they are of another; California Civil Code § 1770(a)(9), by advertising the Baby Food Products with intent not to sell them as advertised; and California Civil Code § 1770(a)(16), by representing that the Baby Food Products have been supplied in accordance with previous representations when they have not.

219.     The facts concealed or not disclosed by Gerber to the California Plaintiffs and members of the California Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products as described above.

220.     Gerber knew that its omissions of fact were material information that the California Plaintiffs and the California Class would have wanted to know and Gerber intentionally omitted and failed to disclose this information to induce the California Plaintiffs and the California Class to purchase its Baby Food Products.

221.     Reasonable consumers, including the California Plaintiffs and the California Class, did not know or suspect that the Baby Food Products were unsafe or contained or materially risked containing Heavy Metals.

222.     By letters dated March 12, 2021, Plaintiff Verduzco provided Gerber with pre-suit notice of the claims asserted herein on behalf of herself and the members of the California Class.

69

More than 30 days have passed and Defendant has not remedied the violations of law asserted in the pre-suit notice.  Accordingly, Plaintiff Verduzco seeks damages on behalf of herself and the California Class.

223.    As a direct and proximate result of these violations, the California Plaintiffs and the California Class have been harmed, and that harm will continue unless Gerber is enjoined from using the misleading practices described herein in any manner in connection with the advertising and sale of the Baby Food Products.

224.    Gerber's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

225.    As a direct and proximate result of Gerber's conduct, the California Plaintiffs and members of the California Class have suffered damages in that they purchased Baby Food Products that were worthless or worth less than the price they paid and that they would not have purchased at all had they known of the material risk and/or presence of Heavy Metals and/or other toxic ingredients.

226.    Plaintiff Verduzo, on behalf of herself and the California Class, seeks all available monetary relief, including actual and punitive damages and restitution, reasonable attorneys' fees and costs, and all California Plaintiffs, on behalf of themselves and the California Class, seek an order enjoining Gerber's illegal practices as alleged herein.

**FIFTH CAUSE OF ACTION**
**Violations of California's False Advertising Law,**
**California Business & Professions Code §§17500,** *et seq*.,
**(On Behalf of the California Plaintiffs and the California Class)**

227.    The California Plaintiffs repeat and reallege the allegations contained in paragraphs 1-169 as though fully set forth herein.

228.    The California Plaintiffs bring this claim individually and on behalf of the California Class.

229.    California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading."  Cal. Bus. & Prof. Code §17500.

230.    As alleged herein, Gerber failed to disclose material facts to the California Plaintiffs and the California Class including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

231.    Gerber's packaging creating the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children was untrue or misleading in light of the foregoing material omissions.

232.    Additionally, Gerber knew, or reasonably should have known, that its omissions rendered its packaging untrue or misleading and that the omissions were material to reasonable consumers.

233.    The facts concealed or not disclosed by Gerber to the California Plaintiffs and members of the California Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products as described hereinabove.

234.    Gerber knew that its omissions were material information that the California Plaintiffs and the California Class would have wanted to know and Gerber intentionally omitted

71

and failed to disclose this information to induce the California Plaintiffs and the California Class to purchase its Baby Food Products.

235.    The California Plaintiffs did not know or suspect that the Baby Food Products were unsafe or contained or materially risked containing Heavy Metals.

236.    As a direct and proximate result of these violations, the California Plaintiffs and the California Class have been harmed, and that harm will continue unless Gerber is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Baby Food Products.

237.    Gerber's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

238.    As a direct and proximate result of Gerber's conduct, the California Plaintiffs and members of the California Class have suffered damages in that they purchased the Baby Food Products that were worthless or worth less than the price they paid and that they would not have purchased at all had they known of the material risk and/or presence of Heavy Metals and/or other toxic ingredients.

239.    The California Plaintiffs, on behalf of themselves and the California Class, seek all available equitable relief, including restitution, declaratory and injunctive relief, and reasonable attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5.

**SIXTH CAUSE OF ACTION**
**Violations of California's Unfair Competition Law,**
**California Business & Professions Code §§17200, *et seq*.,**
**(On Behalf of the California Plaintiffs and the California Class)**

240.    The California Plaintiffs repeat and reallege the allegations contained in paragraphs 1-169 as though fully set forth herein.

241.    The California Plaintiffs bring this claim individually and on behalf of the California Class.

242.    The Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200:

**Fraudulent**

243.    As alleged herein, Gerber failed to disclose material facts to the California Plaintiffs and the California Class, including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

244.    Gerber's packaging creating the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children was untrue or misleading in light of the foregoing material omissions.

245.    Gerber's omissions are false and likely to deceive reasonable consumers, including the California Plaintiffs and the California Class.

**Unlawful**

246.    Gerber's' actions as alleged herein violate at least the following laws:

(a)    The CLRA, California Business & Professions Code § 1750, *et seq*.;

(b)    The False Advertising Law, California Business & Professions Code § 17500, *et seq*.; and

(c)    Song-Beverly Consumer Warranty Act, Cal. Civil Code § 1790, *et seq*.

**Unfair**

247.    Gerber's conduct with respect to the packaging, advertising, marketing, and sale of the Baby Food Products is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

248.    Gerber's conduct with respect to the packaging, advertising, marketing, and sale of the Baby Food Products is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including, but not limited to, the False Advertising Law and the CLRA.

249.    Gerber's conduct with respect to the packaging, advertising, marketing, and sale of the Baby Food Products is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves can reasonably avoid.

250.    The facts concealed or not disclosed by Gerber to the California Plaintiffs and members of the California Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products as described hereinabove.

251.    Gerber knew that its omissions were material information that the California Plaintiffs and the California Class would have wanted to know and Gerber intentionally omitted and failed to disclose this information to induce the California Plaintiffs and the California Class to purchase its Baby Food Products.

252.    The California Plaintiffs did not know or suspect that the Baby Food Products were unsafe or contained or materially risked containing Heavy Metals.

253.    Gerber's conduct was also unfair because it placed into the marketplace Baby Food Products that it knew contained or were at a material risk of containing harmful Heavy Metals, and because it did not test all ingredients, or finished products, for all Heavy Metals.  Further, when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards. Such conduct is immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.  Such conduct also violates public policy as declared by specific constitutional, statutory, or regulatory provisions.  Gerber's conduct is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves can reasonably avoid.

254.    There were reasonably available alternatives to further Gerber's legitimate business interests, other than the conduct described herein.

255.    As a result of Gerber's practices, the California Plaintiffs have suffered injury in fact and lost money.  Further, Gerber's unfair business practices are ongoing and continuing and California Plaintiffs and the California Class will continue to suffer harm unless Gerber is enjoined from the unfair business practices alleged herein.

256.    The California Plaintiffs, on behalf of themselves and the California Class, seek all available equitable relief, including restitution, declaratory and injunctive relief, and reasonable attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5.

**SEVENTH CAUSE OF ACTION**

75

**Violations of California's Song-Beverly Consumer Warranty Act
Cal. Civ. Code § 1790, *et seq*.
(On Behalf of the California Plaintiffs and the California Class)**

257. The California Plaintiffs repeat and reallege the allegations contained in paragraphs 1-169 as though fully set forth herein.

258. This claim is brought by the California Plaintiffs individually on behalf of themselves and on behalf of the California Class.

259. Gerber's Baby Food Products are and were at all relevant times consumer goods within the meaning of Cal. Civ. Code § 1791(a).

260. The California Plaintiffs and the members of the California Class are and were at all relevant times buyers within the meaning of Cal. Civ. Code § 1791(b).

261. Gerber is and was at all relevant times a manufacturer as defined by Cal. Civ. Code § 1791(j). At the time of purchase Gerber was in the business of selling consumer goods for sale to consumers.

262. A warranty that the Baby Food Products were in merchantable condition and fit for consumption is implied by law pursuant to Cal. Civ. Code §§ 1791.1 & 1792.

263. The California Plaintiffs and the members of the California Class purchased the Baby Food Products manufactured and marketed by Gerber by and through Gerber's authorized sellers for retail or online. At all relevant times, Gerber was the merchant, manufacturer, marketer, warrantor, and/or seller of the Baby Food Products and knew or had reason to know of the specific use for which they were purchased.

264. Gerber impliedly warranted to the California Plaintiffs and the California Class that the Baby Food Products were of merchantable quality and fit for their ordinary use and intended purpose, including that the food was nutritious and safe for consumption by infants and young

76

children.  However, the Baby Food Products when sold at all times were not in merchantable condition and were and are not fit for the ordinary and intended purpose of providing safe and nutritious food for babies and children because Gerber failed to disclose material facts including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

265.    The California Plaintiffs and members of the California Class relied on Defendant's skill and judgment and implied warranties when they purchased the Baby Food Products. However, contrary to such implied warranties, the Baby Food Products were not of merchantable quality or fit for their ordinary use and intended purpose, consumption by infants or young children, as they contained, or were at material risk of containing, Heavy Metals and/or other ingredients or contaminants.

266.    As a consequence, Gerber breached its implied warranties upon selling such Baby Food Products, as each product contained or materially risked containing Heavy Metals and/or other toxic ingredients or contaminants.

267.    Gerber cannot disclaim its implied warranty as it knowingly sold unsafe and hazardous Baby Food Products.

268.    Gerber had sufficient notice of its breach of implied warranties as it has, and had, exclusive knowledge of manufacturing processes, quality control policies, the physical and

chemical make-up of the Baby Food Products, and whether the ingredients contained Heavy Metals.

269.    Gerber was also on notice as it was aware of the presence or material risk of the Heavy Metals in the Baby Food Products due to its own testing and/or expertise, and based on the investigation in the HBBF Report that revealed the Baby Food Products as containing various toxic Heavy Metals.  Additionally, prior to filing of this case, the Subcommittee requested internal documents and test results from Gerber as part of its investigation into the presence of Heavy Metals in baby foods.

270.    Gerber was also provided notice by the numerous class action complaints filed against it.

271.     Affording Gerber further opportunity to cure its breach of implied warranties would be unnecessary and futile here because Gerber has known of and concealed the safety of its Baby Food Products.

272.    As a direct and proximate result of Gerber's breach of implied warranty, the California Plaintiffs and members of the California Class have been damaged in an amount to be proven at trial.

273.    The California Plaintiffs and members of the California Class have been excused from performance of any warranty obligations as a result of Gerber's conduct described herein.

274.    Privity exists because Gerber impliedly warranted to the California Plaintiffs and members of the California Class through the packaging that the Baby Food Products were nutritious products safe for consumption by infants and young children, but these warranties were false by failing to make any mention of the presence or material risk of toxic Heavy Metals.

275.    As a direct and proximate result of Gerber's conduct, the California Plaintiffs and members of the California Class have suffered damages in that they have purchased Baby Food Products that are worthless or worth less than the price they paid and that they would not have purchased at all had they known the presence or material risk of Heavy Metals and/or other toxic ingredients.

276.    The California Plaintiffs and members of the California Class seek damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

**EIGHTH CAUSE OF ACTION**
**Violation of Florida's Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201, *et seq*.**
**(On Behalf of Plaintiffs Renee Bryan, Jennifer Gaetan, Vanessa Inoa, and the**
**Florida Class)**

277.    Plaintiffs Renee Bryan, Jennifer Gaetan, and Vanessa Inoa (the "Florida Plaintiffs") repeat and reallege the allegations contained in paragraphs 1-169 as though fully set forth herein.

278.    The Florida Plaintiffs bring this claim individually and on behalf of the Florida Class for violations of Florida Deceptive and Unfair Trade Practices Act, ("FDUTPA"), Fla.  Stat. §§ 501.201 et seq.

279.    The Florida Plaintiffs and the members of the Florida Class are "consumers," as defined by Fla. Stat. § 501.203(7), the Baby Food Products sold by Gerber are "good[s]" and the transactions at issue constitute "trade or commerce" as defined by Fla. Stat. § 501.203(8) in that Gerber advertised, offered for sale, sold or distributed goods or services in Florida and/or engaged in trade or commerce directly or indirectly affecting the people of Florida.

280.   Fla.   Stat.   §   501.204   provides   that   "[u]nfair   methods   of   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

281.   For the reasons discussed herein, Gerber violated and continues to violate FDUTPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by FDUTPA.  Gerber's acts and practices, including its material omissions described herein, were likely to, and did in fact, deceive and mislead members of the public, including the Florida Plaintiffs and the members of the Florida Class to their detriment.

282.   As alleged herein, Gerber failed to disclose material facts to the Florida Plaintiffs and the Florida Class including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

283.   Gerber's packaging creating the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children was untrue or misleading in light of the foregoing material omissions.

284.   The facts concealed or not disclosed by Gerber to the Florida Plaintiffs and members of the Florida Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products as described hereinabove.

285.    Gerber knew that its omissions were material information that the Florida Plaintiffs and the Florida Class would have wanted to know, and Gerber intentionally omitted and failed to disclose this information to induce the Florida Plaintiffs and the Florida Class to purchase its Baby Food Products.

286.    The Florida Plaintiffs did not know or suspect that the Baby Food Products were unsafe or contained or materially risked containing Heavy Metals.

287.    As a direct and proximate result of these violations, the Florida Plaintiffs and the Florida Class have been harmed, and that harm will continue unless Gerber is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Baby Food Products.

288.    As a direct and proximate result of Gerber's conduct, the Florida Plaintiffs and members of the Florida Class have suffered damages in that they purchased the Baby Food Products that were worthless or worth less than the price they paid and that they would not have purchased at all had they known of the material risk and/or presence of Heavy Metals and/or other toxic ingredients.

289.    The Florida Plaintiffs and the members of the Florida Class seek relief for the injuries they have suffered as a result of Gerber's unfair and deceptive acts and practices, as provided by FDUTPA and applicable law, including actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

## NINTH CAUSE OF ACTION
**Violations of Illinois' Consumer Fraud and Deceptive Business Practices Act**
**815 Ill. Comp. Stat. 505/1, *et seq.*,**
**(On Behalf of Plaintiff Charlotte Willoughby and the Illinois Class)**

290.    Plaintiff Charlotte Willoughby (the "Illinois Plaintiff") repeats and realleges the allegations contained in paragraphs 1-169 as though fully set forth herein.

291.    The Illinois Plaintiff brings this claim individually and on behalf of the Illinois Class for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.* ("ICFA").

292.    ICFA 505/2 § 2 states that "[u]nfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby."

293.    Gerber engaged in a deceptive act or practice in violation of ICFA in that, as alleged herein, Gerber failed to disclose material facts to the Illinois Plaintiff and the Illinois Class including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

294.    Gerber's packaging creating the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children was untrue or misleading in light of the foregoing material omissions.

295.    The facts concealed or not disclosed by Gerber to the Illinois Plaintiff and members of the Illinois Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products as described herein above.

296.     Gerber knew that its omissions were material information that the Illinois Plaintiff and the Illinois Class would have wanted to know and Gerber intentionally omitted and failed to disclose this information to induce the Illinois Plaintiff and the Illinois Class to purchase its Baby Food Products.

297.     The Illinois Plaintiff did not know or suspect that the Baby Food Products were unsafe or contained or materially risked containing Heavy Metals.

298.     Gerber intended for the Illinois Plaintiff and the Illinois Class members to rely on its material omissions in deciding whether to purchase the Baby Food Products and at what price.

299.     Gerber's concealment, material omissions, and other deceptive conduct were likely to deceive consumers with respect to the presence or material risk of Heavy Metals in the Baby Food Products.

300.     Gerber's concealment, material omissions, and other deceptive conduct did in fact deceive the Illinois Plaintiff and the Illinois Class with respect to the presence or material risk of Heavy Metals in the Baby Food Products.

301.     Gerber's concealment, material omissions, and other deceptive conduct described herein repeatedly occurred in Gerber's trade or business and were capable of deceiving a substantial portion of the consuming public.

302.     As a direct and proximate result of these violations, the Illinois Plaintiff and the Illinois Class have been harmed, and that harm will continue unless Gerber is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Baby Food Products.

303.     Gerber's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

304.    As a direct and proximate result of Gerber's conduct, the Illinois Plaintiff and members of the Illinois Class have suffered damages in that they purchased the Baby Food Products that were worthless or worth less than the price they paid and that they would not have purchased at all had they known of the material risk and/or presence of Heavy Metals and/or other toxic ingredients.

305.    As a direct and proximate result of the deceptive, misleading, unfair, and unconscionable practices of Gerber set forth above, the Illinois Plaintiff and the Illinois Class members are entitled to actual damages, compensatory damages, penalties, attorneys' fees, and costs, as set forth in Section 1 of the ICFA.

306.    Gerber's deceptive, misleading, unfair, and unconscionable practices set forth above were done willfully, wantonly, and maliciously entitling the Illinois Plaintiff and the Illinois Class members to an award of punitive damages.

### TENTH CAUSE OF ACTION
**Violations of New York's Deceptive Acts and Practices Act**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of Plaintiffs Angelique Velez, Danielle Visconti and the New York Class)**

307.    Plaintiffs Angelique Velez and Danielle Visconti (the "New York Plaintiffs") repeat and reallege the allegations contained in paragraphs 1-169, as though fully set forth herein.

308.    The New York Plaintiffs bring this claim individually and on behalf of the members of the New York Class for violations of the New York Deceptive Acts and Practices Act ("NYDAPA"), N.Y. Gen. Bus. Law § 349.

309.    The New York Plaintiffs and the members of the New York Class and Gerber are "persons" under NYDAPA. N.Y.  Gen. Bus.  Law § 349(h).

310.    Gerber's actions as set forth herein occurred in the conduct of trade or commerce under NYDAPA and the sale and distribution of the Baby Food Products was and is a consumer-oriented acted and thereby falls under the NYDAPA.

311.    The NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law § 349.

312.    Gerber's conduct as set forth herein, constitutes deceptive acts or practices under this section. As alleged herein, Gerber failed to disclose material facts to the New York Plaintiffs and the New York Class including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

313.    Gerber's packaging creating the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children was untrue or misleading in light of the foregoing material omissions.

314.    Gerber intentionally and knowingly failed to disclose material facts regarding its Baby Food Products with intent to mislead the New York Plaintiffs and members of the New York Class and breached their duty not to do so.

315.    The facts concealed or not disclosed by Gerber to the New York Plaintiffs and members of the New York Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products as described hereinabove.

316.     Gerber knew that its omissions were material information that the New York Plaintiffs and the New York Class would have wanted to know and Gerber intentionally omitted and failed to disclose this information to induce the New York Plaintiffs and the New York Class to purchase its Baby Food Products.

317.     The New York Plaintiffs did not know or suspect that the Baby Food Products were unsafe or contained or materially risked containing Heavy Metals.

318.     Gerber's concealment, material omissions, and other deceptive conduct were likely to deceive consumers with respect to the presence or material risk of Heavy Metals in the Baby Food Products.

319.     Gerber's concealment, material omissions, and other deceptive conduct did in fact deceive the New York Plaintiffs and the New York Class with respect to the presence or material risk of Heavy Metals in the Baby Food Products.

320.     Gerber's concealment, material omissions, and other deceptive conduct described herein repeatedly occurred in Gerber's trade or business and were capable of deceiving a substantial portion of the consuming public.

321.     As a direct and proximate result of these violations, the New York Plaintiffs and the New York Class have been harmed, and that harm will continue unless Gerber is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Baby Food Products.

322.     Gerber's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

323.     As a direct and proximate result of Gerber's conduct, the New York Plaintiffs and members of the New York Class have suffered damages and an ascertainable loss in that they

purchased the Baby Food Products that were worthless or worth less than the price they paid and that they would not have purchased at all had they known of the material risk and/or presence of Heavy Metals and/or other toxic ingredients.

324.    The New York Plaintiffs and members of the New York Class seek relief for the injuries they have suffered as a result of Gerber's unfair and deceptive acts and practices, as provided by the NYDAPA and applicable law, including actual damages, statutory damages, injunctive relief, and attorneys' fees and costs.

### ELEVENTH CAUSE OF ACTION
### Violations of New York's False Advertising Act N.Y. Gen. Bus. Law § 350
### (On Behalf of Plaintiffs Angelique Velez, Danielle Visconti and the New York Class)

325.    The New York Plaintiffs repeat and reallege the allegations contained in paragraphs 1-169, as though fully set forth herein.

326.    The New York Plaintiffs bring this claim individually and on behalf of the members of the New York Class for violations of the New York False Advertising Act ("NYFAA"), N.Y. Gen. Bus. Law § 350.

327.    The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. "False" includes "advertising, including labeling of a commodity ... if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of ... representations [made] with respect to the commodity..." N.Y. Gen. Bus. Law § 350(a).

328.    Gerber caused to be made or disseminated throughout New York, through advertising and marketing on the packaging, material omissions that were untrue or misleading, and that were known or should have been known through the exercise of reasonable care by Gerber to be untrue and misleading.

329.   Gerber made numerous material omissions of fact with intent to mislead and deceive consumers concerning its Baby Food Products.  Specifically, as alleged herein, Gerber failed to disclose material facts to the New York Plaintiffs and the New York Class including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

330.   Gerber's packaging creating the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children was untrue or misleading in light of the foregoing material omissions. Gerber intentionally and knowingly failed to disclose material facts regarding its Baby Food Products with intent to mislead the New York Plaintiffs and members of the New York Class and breached their duty not to do so.

331.   The facts concealed or not disclosed by Gerber to the New York Plaintiffs and members of the New York Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products as described hereinabove.

332.   Gerber knew that its omissions were material information that the New York Plaintiffs and the New York Class would have wanted to know and Gerber intentionally omitted and failed to disclose this information to induce the New York Plaintiffs and the New York Class to purchase its Baby Food Products.

333.    The New York Plaintiffs did not know or suspect that the Baby Food Products were unsafe or contained or materially risked containing Heavy Metals.

334.    Gerber's concealment, material omissions, and other deceptive conduct were likely to deceive consumers with respect to the presence or material risk of Heavy Metals in the Baby Food Products.

335.    Gerber's concealment, material omissions, and other deceptive conduct did in fact deceive the New York Plaintiffs and the New York Class with respect to the presence or material risk of Heavy Metals in the Baby Food Products.

336.    Gerber's concealment, material omissions, and other deceptive conduct described herein repeatedly occurred in Gerber's trade or business and were capable of deceiving a substantial portion of the consuming public.

337.    As a direct and proximate result of these violations, the New York Plaintiffs and the New York Class have been harmed, and that harm will continue unless Gerber is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Baby Food Products.

338.    Gerber's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

339.    As a direct and proximate result of Gerber's conduct, the New York Plaintiffs and members of the New York Class have suffered damages and an ascertainable loss in that they purchased the Baby Food Products that were worthless or worth less than the price they paid and that they would not have purchased at all had they known of the material risk and/or presence of Heavy Metals and/or other toxic ingredients.

340.    The New York Plaintiffs and members of the New York Class seek relief for the injuries they have suffered as a result of Gerber's unfair and deceptive acts and practices, as provided by the NYFAA and applicable law, including actual damages, statutory damages, injunctive relief, and attorneys' fees and costs.

**TWELFTH CAUSE OF ACTION**
**Violations of Texas' Deceptive Trade Practices and Consumer Protection Act**
**Tex. Bus. & Com. Code §§ 17.41, *et seq.***
**(On Behalf of Plaintiffs Jessica Moore, Janice Wilson, and the Texas Class)**

341.    Plaintiffs Jessica Moore and Janice Wilson (the "Texas Plaintiffs") repeat and reallege the allegations contained in paragraphs 1-169, as though fully set forth herein.

342.    The Texas Plaintiffs bring this claim individually and on behalf of the members of the Texas Class for violations of Texas Deceptive Trade Practices and Consumer Protection Act ("TDTPA"), Tex. Bus. & Com. Code §§ 17.41 et seq.

343.    Plaintiff Moore provided written notice of the specific complaint and damages to Gerber, in accordance with Tex. Bus. & Com. Code § 17.05, by letter dated February 23, 2021. Gerber did not favorably respond within 60 days of the notice.  Alternatively, further notice by or on behalf of any Texas Class member would be futile and is excused.

344.    At all material times herein, Gerber engaged in "trade" or "commerce" as defined by the TDTPA.

345.    The TDTPA, Tex. Bus. & Com. Code § 17.46, makes it unlawful to commit "[f]alse, misleading, and deceptive acts or practices in the conduct of any trade or commerce."

346.    For the reasons discussed herein, Gerber violated and continues to violate the TDTPA by making material omissions of fact with intent to mislead and deceive consumers concerning its Baby Food Products. Specifically, as alleged herein, Gerber failed to disclose

90

material facts to the Texas Plaintiffs and the Texas Class including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

347.    Gerber's packaging creating the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children was untrue or misleading in light of the foregoing material omissions. Gerber intentionally and knowingly failed to disclose material facts regarding its Baby Food Products with intent to mislead the Texas Plaintiffs and members of the Texas Class and breached their duty not to do so.

348.    The facts concealed or not disclosed by Gerber to the Texas Plaintiffs and members of the Texas Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products as described hereinabove.

349.    Gerber knew that its omissions were material information that the Texas Plaintiffs and the Texas Class would have wanted to know and Gerber intentionally omitted and failed to disclose this information to induce the Texas Plaintiffs and the Texas Class to purchase its Baby Food Products.

350.    The Texas Plaintiffs did not know or suspect that the Baby Food Products were unsafe or contained or materially risked containing Heavy Metals.

351.    Gerber's concealment, material omissions, and other deceptive conduct were likely to deceive consumers with respect to the presence or material risk of Heavy Metals in the Baby Food Products.

352.    Gerber's concealment, material omissions, and other deceptive conduct did in fact deceive the Texas Plaintiffs and the Texas Class with respect to the presence or material risk of Heavy Metals in the Baby Food Products.

353.    Gerber's concealment, omissions, and other deceptive conduct described herein repeatedly occurred in Gerber's trade or business and were capable of deceiving a substantial portion of the consuming public.

354.    As a direct and proximate result of these violations, the Texas Plaintiffs and the Texas Class have been harmed, and that harm will continue unless Gerber is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Baby Food Products.

355.    Gerber's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

356.    As a direct and proximate result of Gerber's conduct, the Texas Plaintiffs and members of the Texas Class have suffered damages and an ascertainable loss in that they purchased the Baby Food Products that were worthless or worth less than the price they paid and that they would not have purchased at all had they known of the material risk and/or presence of Heavy Metals and/or other toxic ingredients.

357.    Gerber's deceptive trade practices caused injury in fact and actual damages to the Texas Plaintiffs and members of the Texas Class in the form of the loss or diminishment of value of the Baby Food Products that the Texas Plaintiffs and the members of the Texas Class purchased, which allowed Gerber to profit at the expense of said purchasers.

358.    Plaintiff Moore, on behalf of herself and the Texas Class, seeks all available monetary relief, including economic damages and reasonable attorneys' fees and costs, for the

injuries they have suffered as a result of Gerber's unfair and deceptive acts and practices, as provided by TDTPA, Tex. Bus. & Com. Code § 17.50(b) and applicable law. All Texas Plaintiffs, on behalf of themselves and the Texas Class, seek an order enjoining Gerber's illegal practices.

## THIRTEENTH CAUSE OF ACTION
### Violations of Virginia's Consumer Protection Act
### Va. Code Ann. § 59.1-196, *et seq.*
### (On Behalf of Plaintiffs and the Class)

359.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-169 as though fully set forth herein.

360.    Plaintiffs bring this cause of action individually and on behalf of the Class for violations of the Virginia Consumer Protection Act ("VCPA"), Va. Code Ann. § 59.1-196, *et seq.*

361.    Gerber, Plaintiffs and the Class are "persons" within the meaning of Va. Code Ann. § 59.1-198.

362.    Gerber is a "supplier" within the meaning of Va. Code Ann. § 59.1-198 and the purchases of the Baby Food Products were a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

363.    The VCPA makes unlawful "fraudulent acts or practices." Va. Code Ann. § 59.1-200(A).

364.    Gerber violated the VCPA, at a minimum, by: "5. Misrepresenting that goods or services have certain qualities, characteristics, ingredients, uses, or benefits;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade, style or model;" "8. Advertising goods or services with intent not to sell them as advertised;" and "14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(A).

365.    Gerber violated and continues to violate the foregoing provisions of the VCPA by making material omissions of fact with intent to mislead and deceive consumers concerning its Baby Food Products. Specifically, as alleged herein, Gerber failed to disclose material facts to Plaintiffs and the Class including that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

366.    Gerber's packaging created the impression that the Baby Food Products are nutritious products that are safe for consumption by infants and young children was untrue or misleading in light of the foregoing material omissions. Gerber intentionally and knowingly failed to disclose material facts regarding its Baby Food Products with intent to mislead Plaintiffs and the Class and breached their duty not to do so.

367.    The facts concealed or not disclosed by Gerber to Plaintiffs and members of the Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Baby Food Products as described hereinabove.

368.    Gerber knew that its omissions were material information that Plaintiffs and the Class would have wanted to know and Gerber intentionally omitted and failed to disclose this information to induce Plaintiffs and the Cass to purchase its Baby Food Products.

369.    Plaintiffs did not know or suspect that: (1) the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and

94

that (3) when Gerber does set internal standards, they allow for the sale of Baby Food Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards.

370.    Plaintiffs and the Class reasonably relied on Gerber's material omissions in purchasing the Baby Food Products.

371.    Gerber's concealment, material omissions, and other deceptive conduct were likely to deceive reasonable consumers.

372.    Gerber's concealment, material omissions, and other deceptive conduct described herein repeatedly occurred in Gerber's trade or business and were capable of deceiving a substantial portion of the consuming public.

373.    Gerber knew of should have known that its conduct violated the VCPA.

374.    As a direct and proximate result of these violations, Plaintiffs and the Class have been harmed, and that harm will continue unless Gerber is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Baby Food Products.

375.    Gerber's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

376.    As a direct and proximate result of Gerber's conduct, Plaintiffs and members of the Class have suffered damages and an ascertainable loss in that they purchased the Baby Food Products that were worthless or worth less than the price they paid and that they would not have purchased at all had they known of the material risk and/or presence of Heavy Metals and/or other toxic ingredients.

377.    Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs and the Class who suffered a loss

as the result of a violation of this chapter are entitled to recover actual damages, or $500, whichever is greater, plus reasonable attorneys' fees and costs. Moreover, because the violation was willful, it may increase damages to an amount not exceeding three times the actual damages sustained, or $1,000, whichever is greater.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Nationwide Class and State Classes, pray for relief and judgment against Defendant as follows:

a. An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendant to bear the costs of class notice;

b. An order enjoining Defendant from selling the Baby Food Products until the harmful Heavy Metals are removed or reduced to nondetectable levels and/or full disclosure of the presence of such prominently appears on all packaging;

c. An order requiring Defendant to establish sourcing and control protocols, consult with an independent auditor, and conduct compliance testing;

d. An order enjoining Defendant from selling its Baby Food Products in any manner suggesting or implying that they are healthy, nutritious, and safe for consumption unless Defendant adequately tests for Heavy Metals and ensures that the Heavy Metals are no longer present or reduced to nondetectable levels;

e. An order requiring Defendant to engage in a corrective advertising campaign and to engage in any further necessary affirmative injunctive relief, such as recalling existing products;

96

f.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

g.      An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of law, plus pre- and post-judgment interest thereon;

h.      An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

i.      Awarding Plaintiffs and the Class compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

j.      Awarding Plaintiffs and the Class appropriate relief, including actual and statutory damages;

k.      Awarding Plaintiffs and the Class punitive damages, as allowable by law;

l.      Awarding Plaintiffs and the Class the costs of prosecuting this action, including expert witness fees;

m.      Awarding Plaintiffs and the Class reasonable attorneys' fees and costs as allowable by law;

n.      Awarding pre-judgment and post-judgment interest; and

o.      Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: June 3, 2022

By:    */s/ Steven J. Toll*

Steven J. Toll
**COHEN MILSTEIN SELLERS &**
  **TOLL, PLLC**
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Rosemary M. Rivas
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: 510-350-9700
Facsimile: 510-350-9701

Janine Pollack
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th
Floor
New York, New York 10036
Telephone: 212-899-1765
Facsimile: 332-206-2073

*Plaintiffs' Interim Co-Lead Counsel*