IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

Master File No. 1:21-cv-00269 (MSN/JFA)

IN RE: GERBER PRODUCTS COMPANY
HEAVY METALS BABY FOOD
LITIGATION

This Document Relates to ALL Cases

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO GERBER PRODUCTS COMPANY'S MOTION TO OVERRULE OBJECTIONS AND COMPEL PLAINTIFFS' ANSWERS TO INTERROGATORIES AND <u>PRODUCTION OF DOCUMENTS</u>

**TABLE OF CONTENTS**

Table of Authorities .................................................................................................... iii

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 2

    A. Gerber's Marketing and Labeling Conveys to Parents that its Products are Safe, Suitable, and Healthy for Babies and Young Children ................................................ 2

    B. Congressional Report Finds that Gerber's Baby Foods are Tainted with Dangerous Levels of Heavy Metals. ........................................................................................... 3

    C. Plaintiffs' Allegations and Claims. .................................................................... 5

    D. Gerber's Interrogatories and Document Requests ............................................. 6

ARGUMENT .............................................................................................................. 7

    I.    GERBER'S MOTION TO COMPEL SHOULD BE DENIED BECAUSE PLAINTIFFS ASSERTED VALID OBJECTIONS ......................................... 7

        A. Plaintiffs Should Not Be Required to Respond to Contention Interrogatories and/or Interrogatories that Call for Expert Opinion at this Time as they are Premature ........................................................................................... 7

            1. Gerber's contention interrogatories are improper at this stage. ............... 7

            2. Gerber seeks premature disclosure of expert opinions ........................... 10

        B. Plaintiffs Should not be Compelled to Respond to Discovery Seeking Irrelevant Matter and Matter that is Disproportionate to the Needs of the Case ............... 13

            1. Discovery regarding the medical conditions of Plaintiffs' children (Interrogatory No. 14) ........................................................................ 13

            2. Discovery regarding Plaintiffs' consideration and purchases of non-Gerber foods ................................................................................................... 16

        C. It is Proper for Plaintiffs to Respond to Discovery Subject to their Objections .... 19

    II.    GERBER VIOLATED CMO NO. 2 BY SERVING 220 INTERROGATORIES ...... 20

    III.    COSTS AND ATTORNEYS' FEES ARE NOT WARRANTED HERE ................. 23

CONCLUSION..................................................................................................................23

## TABLE OF AUTHORITIES

<u>Cases</u>

*Astiana v. Kashi Co.*,
    291 F.R.D. 493 (S.D. Cal. 2013) ………………………………… ................ …….17

*Bond v. Arrowhead Reg'l Med. Ctr.*,
    No. ED CV 11-2049-DPP (PLA), 2014 WL 12853147 (C.D. Cal. Feb. 11, 2014)...........10

*Doe v. Lexington-Fayette Urb. Cnty. Gov't*,
    407 F.3d 755 (6th Cir. 2005) ...................................................................................23

*Does v. Cabell Cty. Bd. of Educ.*,
    No. 3:21-cv-00031, 2022 WL 288193 (S.D. W.Va. Jan. 31, 2022) ..................................14

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
    326 F.R.D. 592 (N.D. Cal. 2018) .....................................................................12

*Gorrell v. Sneath*,
    292 F.R.D. 629 (E.D. Cal. 2013)........................................................................10

*In re Coca-Cola Products. Mktg. & Sales Practices Litig. (No. II)*,
    No. 14-md-02555-JSW (MEJ), 2015 WL 5043846 (N.D. Cal. Aug. 26, 2015).........17, 18

*In re Convergent Technologies Sec. Litig.*,
    108 F.R.D. 328 (N.D. Cal. 1985) .........................................................................9

*In re Domestic Drywall Antitrust Litig.*,
    300 F.R.D. 228 (E.D. Pa. 2014) ......................................................................7, 9

*In re Peanut Farmers Antitrust Litig.*,
    No. 2:19cv00463, 2020 WL 9216019 (E.D. Va. July 24, 2020)......................................19

*In re Peanut Farmers Antitrust Litig.*,
    No. 2:19cv00463, 2020 WL 8970814 (E.D. Va. July 27, 2020).........................................8

*Krommenhock v. Post Foods, LLC*,
    334 F.R.D. 552 (N.D. Cal. 2020) ......................................................................11

*Lonquist Field Serv., LLC v. Sorby*,
    No. 21-1035-KHV-KGG, 2021 WL 4967041 (D. Kan. Oct. 26, 2021)............................10

*Makaeff v. Trump University, LLC*, Civ. No. 10-CV-0940-GPC (WVG), 2014 WL 3490356
(S.D. Cal. July 11, 2014) ........................................................................................21

*McCarthy v. Paine Webber Grp., Inc.,*
168 F.R.D. 448 (D. Conn. 1996) ...........................................................................9

*McKellips v. Kumho Tire Co., Inc.*,
305 F.R.D. 655 (D. Kan. 2015) ....................................................................... 10, 12

*Mullins v. Premier Nutrition Corp.*,
No. 13-cv-01271-RS, 2016 WL 1535057 (N.D. Cal. Apr. 15, 2016)......................... 14, 15

*Norton v. Knapheide Equip. Co.,*
No. 4:18-cv-01615-SNLJ, 2019 WL 3082631 (E.D. Mo. July 15, 2019) .................. 19, 20

*Pierce v. Underwood*,
487 U.S. 552 (1988) ...............................................................................................23

*Safeco of America v. Rawstron,*
181 F.R.D. 441 (S.D. Cal. 1998)...........................................................................22

*Taggart v. Damon Motor Coach,*
No. 5:05-CV-00191, 2007 WL 152101 (N.D. W.Va. Jan. 17, 2007)...................................9

*Tucker v. Momentive Performance Materials USA, Inc.*,
No. 2:13-cv-04480, 2016 WL 8252929 (S.D. W. Va. Nov. 23, 2016)...............................12

*Wagner v. St. Paul Fire & Marine Ins. Co.*,
238 F.R.D. 418 (N.D.W. Va. 2006) ......................................................................10

*Whitley v. McClain,* No. 4:13-CV-994 (CEJ), 2014 WL 1400178 (E.D. Mo. April 10, 2014).....20

*Yamagata v. Reckitt Benckiser LLC,*
No. 17-cv-03529-VC (RMI), 2018 WL 3155772 (N.D. Cal. June 28, 2018) ...................14

Statutes

Federal Rule of Civil Procedure 26 ...................................................................... 10, 11

Federal Rule of Civil Procedure 33 ................................................................9, 19, 20, 21

Federal Rule of Civil Procedure 37 ................................................................................................23

# INTRODUCTION

Plaintiffs submit this response to Gerber Products Company's ("Gerber" or "Defendant") Motion to Overrule Objections and Compel Plaintiffs' Answers to Interrogatories and Production of Documents ("Motion" or "Mot.") (ECF Nos. 148, 150).  For the reasons discussed below, the Motion should be denied.

Gerber served 16 document requests and 20 interrogatories on *each* Plaintiff, for a total of 220 interrogatories, which far exceeded the limit of 50 set by the Court.  Apart from exceeding the Court's limit, Gerber's discovery requests are objectionable on many other grounds. For example, Gerber propounded interrogatories seeking information about the medical conditions of Plaintiffs' children, although such medical information is confidential by law and Plaintiffs have not alleged claims for personal injury.

Further, Gerber has barely produced a banker's box of documents in this case, and many of those documents are duplicative and consist of publicly available documents. Gerber will not make a substantial document production until September 9, 2022, and then only as to 7 of 18 relevant custodians. Gerber has hampered Plaintiffs' ability to take depositions and to provide important documents to their experts for analysis, yet Gerber demands that Plaintiffs respond to contention interrogatories now, despite case law clearly stating that such interrogatories are not proper until the parties have had the opportunity to conduct substantial discovery.

Moreover, although this Court set a December 15, 2022 deadline for Plaintiffs to complete and serve their expert reports, Gerber demands that Plaintiffs respond to interrogatories that clearly seek scientific and technical information—matters that are the subject of expert testimony. Gerber also, in what appears to be an attempt to harass the Plaintiffs, has demanded that they search their homes, computers, and other devices for information from the last seven years regarding any other

non-Gerber baby foods they have bought, or have considered purchasing, such as receipts, grocery lists, and photos of their children eating such foods. Such information is irrelevant to the parties' claims and defenses and is not proportional to the needs of the case. The Federal Rules simply do not allow such fishing expeditions.

To avoid bringing costly discovery disputes to the Court and to move the case forward efficiently, Plaintiffs responded to a majority of Gerber's discovery requests in good faith, even though Gerber exceeded the Court's limit on interrogatories. As Gerber readily acknowledges, its motion is limited to a select few interrogatories (Interrogatory Nos. 2, 3, 4, 6, 7, 8, 9, 10, 14 and part of 17) and only a single document request (RFP No. 7), which demonstrates Plaintiffs' good faith efforts to respond to all of Gerber's propounded discovery, even where it exceeded the Court's limitations.  Plaintiffs have also met and conferred in good faith as to the discovery issues. As Plaintiffs explain in detail below, Gerber's motion to compel should be denied.

## FACTUAL BACKGROUND

### A.  Gerber's Marketing and Labeling Conveys to Parents that its Products are Safe, Suitable, and Healthy for Babies and Young Children.

Gerber knows that nothing could be more important to a parent's decision on what baby food to buy than whether the product is safe and healthy for their child. This is evidenced by Gerber's promises to parents on its website that the "health and safety of your little one has been and will always be our highest priority," and that "100% of our products meet all FDA requirements." ¶ 76.[1] Gerber claims that it follows an "annual testing plan featuring regular safety tests of finished products." *Id.* Gerber also promises that its farmers are using the "best in class practices to ensure quality ingredients and minimize the presence of any unwanted heavy metals." ¶ 77. In its "Clean Field Farming" marketing campaign, Gerber states that some soil "can have

---

[1] "¶" refers to Plaintiffs' Complaint.  ECF No. 112.

naturally high levels of nitrates and heavy metals which you don't want in your baby's food." ¶ 78. "That's why," Gerber claims, it has "created requirements for growing our fruits and veggies" that are among the strictest in the world. *Id.*

Gerber's product packaging uniformly conveys to consumers that its Products are safe and suitable for consumption by babies and young children. *See* ¶ 80. Each Gerber Product features the famous "Gerber Baby" the company is known for; the iconic logo is meant to convey that Gerber is a company that cares about the health and safety of children. *See id.* Product packages also have other indications that convey the impression that they are safe and suitable for babies and young children. *See* ¶ 81. For example, the Gerber Puff's package depicts a crawling baby and states the product supports "brain development and learning ability." *See id.* Considered as a whole, a reasonable consumer would interpret that the Gerber Puffs are suitable for consumption by babies. *Id.* Gerber's other Products also convey the same message. *See generally* ¶¶ 80-106. Gerber, however, has never disclosed to consumers on its label that its Products contain, or are at material risk of containing, Heavy Metals, or other material facts about its testing and internal standards. *See, e.g.,* ¶¶ 11, 84, 87, 90, 93.

> ### B.   Congressional Report Finds that Gerber's Baby Foods are Tainted with Dangerous Levels of Heavy Metals.

On February 4, 2021, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (the "Subcommittee"), released a report titled, "Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury" ("Congressional Report"). The Congressional Report revealed that Gerber knowingly distributed and sold baby foods with toxic heavy metals such as arsenic, lead, cadmium, and mercury. *See generally* ¶¶ 107-08. The Congressional Report also detailed the harmful effects of Heavy Metals to children based on numerous scientific studies and noted that the FDA has declared that arsenic,

lead, cadmium, and mercury are dangerous to human health, especially to babies and young children. *See* ¶¶ 42, 47.[2] Babies and young children are especially vulnerable to the effects from exposure to Heavy Metals because they are small, and their organs are developing. *See* ¶ 44.

>According to the Congressional Report:
>
>Baby food manufacturers hold a special position of public trust. Consumers believe they would not sell unsafe products. Consumers also believe that the federal government would not knowingly permit the sale of unsafe baby food. As this staff report reveals, baby food manufacturers and federal regulators have broken the faith.

¶ 140. The limited testing that Gerber provided to the Subcommittee showed that Gerber's finished baby food products contained ingredients with significant levels of Heavy Metals. ¶ 108. For example, results from 2017-2019 for arsenic (in rice flour), lead (including in sweet potatoes), and cadmium (carrots) showed such significant levels. *See, e.g.*, ¶¶ 109-111. The Subcommittee faulted Gerber for not testing finished products, which tend to have higher levels of Heavy Metals than ingredients. *See* ¶¶ 5, 120. The Subcommittee's criticism was valid because testing has shown that Gerber's rice cereal products had up to 116 ppb arsenic, above the 100 ppb action level set by the FDA for rice cereal. *See* ¶¶ 118-19.

The Subcommittee decried Gerber's limited testing as showing a "willingness to use ingredients that contained dangerous lead levels." ¶ 110. The Chairman of the Subcommittee told Consumer Reports that, "Left to their own devices, baby food makers have set testing standards in excess of what recommended standards are, and even then, they often violate their standards." ¶ 115. Internal documents showed that Gerber set an internal limit of 40 ppb for lead but sold

---

[2] The World Health Organization ("WHO") has similarly declared arsenic, lead, cadmium, and mercury as dangerous for babies and young children. *See* ¶ 42. The Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") has ranked arsenic as the number one substance that poses the most significant threat to human health, lead as number two, mercury as number three, and cadmium as number seven. *See* ¶¶ 49, 53, 61, 68.

products with ingredients having 48 ppb lead. *See* ¶¶ 110, 114. As to cadmium, Gerber's limited testing showed that it used multiple batches of carrots containing as much as 87 ppb. *See* ¶ 111. The Subcommittee criticized Gerber for burying its head in the sand as to mercury. *See* ¶ 112. According to the Subcommittee, Gerber rarely tested for mercury in its baby foods and then only in certain ingredients such as carrots, sweet potatoes, and lemon juice concentrate. *Id.*

In September 2021, the Subcommittee released a supplemental report, titled, "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods" ("Supplemental Congressional Report"). That report also castigated Gerber for continuing to sell its rice cereals with nearly identical inorganic arsenic levels (up to 116 ppb inorganic arsenic) as Beech-Nut's rice cereal, instead of issuing a recall like Beech-Nut. *See* ¶ 119.

The Subcommittee has criticized both baby food manufacturers and the FDA:

> To this day, baby foods containing toxic heavy metals bear no label or warning to parents. Manufacturers are free to test only ingredients, or, for the vast majority of baby foods, to conduct no testing at all. FDA has only finalized one metal standard for one narrow category of baby food, setting a 100 ppb inorganic arsenic standard for infant rice cereal. But this FDA standard is far too high to protect against the neurological effects on children.[3]

### C.    Plaintiffs' Allegations and Claims.

Plaintiffs allege claims for statutory violations of the consumer protection statutes of California, Florida, Illinois, New York, Texas, and Virginia, and common law claims under each of those state laws for fraudulent concealment/fraud by omission, and unjust enrichment.[4] Plaintiffs' claims rest on allegations that Gerber failed to disclose three pieces of material information about its Products, namely, that (1) they contain or were at material risk of containing

---

[3] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf, at p. 6.
[4] Plaintiffs have agreed to dismiss their claims under the Song-Beverly Act and for breach of the implied warranty of merchantability.

Heavy Metals; (2) Gerber inadequately tested, or never tested, for all Heavy Metals in all the ingredients it uses and/or its finished products; and (3) when Gerber does set internal standards,  it allows for the sale of Products with Heavy Metals in amounts that could cause harm to babies and children and at times, the Baby Food Products have failed to meet even those internal standards. *See, e.g.*, ¶¶ 11, 122, 142, 190, 203, 216, 230, 243, 253, 264, 282, 293, 312, 329, 346, 365. Plaintiffs ask that they be awarded damages for these material omissions and that the Court issue the appropriate injunctive relief. Plaintiffs do not allege claims for personal injury.

### D.    Gerber's Interrogatories and Document Requests

On June 16, 2022, Gerber served 20 interrogatories and 16 RFPs on each Plaintiff.  Mot. at 3.   As discussed below, the number of interrogatories exceeded the limit of 50 total interrogatories set by the Court in its June 7, 2022 Case Management Order No. 2 ("CMO No. 2"). Nonetheless, so as not to delay the litigation, Plaintiffs timely served their objections and then timely served their responses to both the interrogatories and RFPs.  Plaintiffs also produced all their documents on August 1, 2022.  The parties engaged in good faith negotiations through numerous letters and meet and confer calls, as Gerber admits.  *See* Mot. at 3-8.[5]  Plaintiffs will not repeat the meet and confer efforts here or address all of Gerber's mischaracterizations of the meet and confer process as the correspondence speaks for itself. [6]

The instant Motion is limited to a select few interrogatories (Interrogatory Nos. 2, 3, 4, 6, 7, 8, 9, 10, 14 and part of 17); and only a single document request (RFP No. 7), and is limited to

---

[5] For ease of reference, Plaintiffs adopt the same abbreviations for the letters and meet and confers as used in the Motion.

[6] Throughout the meet and confer process and continuing in this Motion, Gerber has persisted in misstating Plaintiffs' position on their objections.  *See* Mot. at 4.  Contrary to Gerber's statement, Plaintiffs' objections were not made solely for preservation purposes and Plaintiffs have never stated they are not "real," yet Gerber repeatedly distort Plaintiffs' position.  Plaintiffs' objections are proper and were made in good faith as explained herein.

three categories of objections, as enumerated above, two of which simply would delay responses by Plaintiffs (not avoid them) until the appropriate stage of the litigation as per well-established litigation practice under the Federal Rules of Civil Procedure and applicable case law.

## ARGUMENT

I.    **GERBER'S MOTION TO COMPEL SHOULD BE DENIED BECAUSE PLAINTIFFS ASSERTED VALID OBJECTIONS.**

As Gerber notes, to the extent Plaintiffs objected to Gerber's discovery, they generally stood on three objections: (1) that certain of the interrogatories constituted premature contention interrogatories and/or (2) that certain of the interrogatories required premature expert opinion and/or (3) that the interrogatories seek irrelevant information and are disproportionate to the needs of the case. Mot. at 7. All such objections are valid and should be sustained.

A.    **Plaintiffs Should Not Be Required to Respond to Contention Interrogatories and/or Interrogatories that Call for Expert Opinion at this Time as they are Premature.**

1.    **Gerber's contention interrogatories are improper at this stage.**

Gerber takes issue with Plaintiffs' objections that certain of the interrogatories constitute premature contention interrogatories to which Plaintiffs should not be required to respond at this early stage of the case before substantial discovery is conducted. This objection covers Interrogatory Nos. 2, 3, 4, 6, 7 and 8. All are contention interrogatories in that they involve contentions and require the application of law to facts. Defendant admits that these interrogatories explicitly request Plaintiffs' contentions but argues nonetheless that the use of the word "contention" is not dispositive because "the information sought determines whether an interrogatory is a 'contention interrogatory.'" Mot. at 12 (quoting *In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 228, 230 (E.D. Pa. 2014)). Similarly, for Interrogatory Nos. 4, 6 and 7, Gerber argues that they "merely seek the factual basis for each Plaintiff's misrepresentation

7

claims – that Gerber's packaging deceived them – and are therefore not contention interrogatories." Mot. at 14.[7]  These arguments do not carry the day.

A review of these interrogatories reveals that "the information sought" supports the conclusion that they are premature contention interrogatories as they request the application of law to fact and seek essentially all of the facts and evidence that Plaintiffs will present at trial to either support their allegations in the Complaint or to defeat Gerber's defenses.  Leaving aside whether the interrogatories even correctly characterize Plaintiffs' allegations, these interrogatories seek evidence that will be developed during discovery which has barely begun.  Gerber has not agreed to substantially complete its document production as to seven priority witnesses it has identified until September 9, 2022, and has not informed Plaintiffs as to when it will substantially complete discovery as to the remaining witnesses.  To date, it has produced about only six reams of

---

[7] Defendant's citation (Mot. at 13) to *In re Peanut Farmers Antitrust Litig.,* No. 2:19cv00463, 2020 WL 8970814 (E.D. Va. July 27, 2020) (E.D. Va. July 27, 2020) is not applicable here because in that case the interrogatories did not explicitly seek the plaintiffs' contentions, as here.  *See id.* (interrogatories at issue lacked "request for Plaintiffs to state their contentions, articulate the facts underlying a contention, assert a position and explain that position in relation to how the law applies to facts, or explain the legal basis for a contention").  While Gerber misleadingly cites only part of Interrogatory 11 from that case (which does not appear in the opinion itself), the court allowed it because it did not ask for the plaintiffs' contentions but rather citation to specific documents, dates, employees and a methodology employed.  *See* ECF No. 154, Interrogatory No. 11 ("Describe how You believe each Defendant manipulated the Peanut prices and inventory numbers reported to USDA NASS—including the identification of (i) any Documents supporting an agreement between Defendants to engage in such manipulation; (ii) any Documents supporting the allegation that a specific Defendant submitted inaccurate, untruthful, or falsified information to USDA NASS; (iii) the date on which a Defendant first made an allegedly inaccurate, untruthful, or falsified submission; (iv) the employees involved in the alleged decision to submit inaccurate, untruthful, or falsified information to USDA NASS; and (v) the methodology or manner by which Defendants allegedly determined or agreed what prices each Defendant would submit.").  In fact, in the opinion, the court gave an example as representing why he ruled the interrogatories at issue were not contention interrogatories.  *See Peanut Farmers Antitrust Litig.,* 2020   WL 8970814(quoting Interrogatory No. 1: "Identify all Persons with Knowledge of facts or Documents concerning the allegations in the Complaint.").  Both Interrogatory No. 1 (cited in the opinion) and Interrogatory No. 11 (not cited in the opinion but cited by Gerber) illustrate that what Gerber has served here are totally different and do in fact seek Plaintiffs' contentions (prematurely).

documents. Plaintiffs must first review a substantial document production before they are even in a position to conduct depositions. It is not until after this discovery has been completed that Plaintiffs should be required to respond to these interrogatories. *See Taggart v. Damon Motor Coach,* No. 5:05-CV-00191, 2007 WL 152101, at *8 (N.D. W.Va. Jan. 17, 2007) ("Where significant discovery has not occurred, a motion to compel contention interrogatories should be denied without prejudice"); *In re Convergent Technologies Sec. Litig.,* 108 F.R.D. 328 (N.D. Cal. Oct. 28, 1985) (postponing the plaintiffs' responses to contention interrogatories (except those relating to the identity of witnesses and documents) until 60 days after substantial completion of the defendant's document production); *McCarthy v. Paine Webber Grp., Inc.,* 168 F.R.D. 448, 450 (D. Conn. 1996) (denying motion to compel responses to interrogatories because discovery had not been substantially completed and the defendant failed to show why it needed responses at that stage of the case); *see also* Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to a fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete").

*Domestic Drywall* on which Defendant relies actually supports Plaintiffs' position. In that case, the defendants "represented that they … largely completed their document production" and the plaintiffs had "shown in some of their briefs" that they "acquired detailed knowledge of some of the documents produced." *In re Domestic Drywall*, 300 F.R.D at 230-31. Here, once Gerber has "largely completed" its document production, and Plaintiffs have had an opportunity to depose Gerber's employees and certain third parties, they will be in a fair position to fully respond to these contention interrogatories. As of now, the bases for Plaintiffs' allegations are detailed in their

9

Complaint and they would not be able to provide more information at this time beyond such allegations without discovery.[8]

### 2. Gerber seeks premature disclosure of expert opinions.

The deadline for Plaintiffs to serve expert reports pursuant to Fed. R. Civ. P. 26(a)(2) is December 15, 2022. To get around Rule 26(a)(2), Gerber seeks to compel responses to interrogatories that plainly require expert analysis and hence prematurely seek Plaintiffs' experts' opinions. Plaintiffs' objections on this basis are proper. See *Gorrell v. Sneath,* 292 F.R.D. 629, 633 (E.D. Cal. 2013) (denying motion to compel response to interrogatory seeking premature expert analysis and stating that experts testify as to scientific, technical or otherwise specialized information pursuant to Fed. R. Evid. 702); *Bond v. Arrowhead Reg'l Med. Ctr.,* No. ED CV 11-2049-DPP (PLA), 2014 WL 12853147, at *2 (C.D. Cal. Feb. 11, 2014) (interrogatory asking whether information given to the detention center presented an urgent medical condition called for premature expert opinion; motion to compel interrogatory denied); *McKellips v. Kumho Tire Co., Inc.*, 305 F.R.D. 655, 681 (D. Kan. 2015) (sustaining objections on the ground that interrogatories

---

[8] Defendant has moved to dismiss Plaintiffs' claims; if the Court denies the motion to dismiss, the parties will proceed based on those allegations which amply put Defendant on notice of the bases for Plaintiffs' claims. As such, Defendant's argument that Plaintiffs' refusal to respond to premature contention interrogatories suggests they do not have a proper factual basis for their claims (Mot. at 11-12) is not well taken, nor is the argument that the Complaint is "unclear" as to what Plaintiffs are alleging regarding Heavy Metals. *Id.* at 11. Defendant's cases in this regard are inapposite. In *Wagner v. St. Paul Fire & Marine Ins. Co.*, 238 F.R.D. 418, 426-27 (N.D.W. Va. 2006), the plaintiffs did not object on the grounds that the request was a contention interrogatory or that discovery had not been substantially completed. Nor could they have, as the docket there shows that the parties had conducted discovery for over a year, therefore the plaintiffs should have been able to provide some facts as to the insured's acts of alleged bad faith. Moreover, the court allowed the plaintiffs to respond to the interrogatory by specifying any areas where discovery was still needed along with providing any basic facts they had to support the complaint. *Id.* at 427. Similarly, in *Lonquist Field Serv., LLC v. Sorby*, No. 21-1035-KHV-KGG, 2021 WL 4967041, at *3 (D. Kan. Oct. 26, 2021), the plaintiff did not object on the grounds that the request was a contention interrogatory or that discovery had not been substantially completed and based on a review of the docket, it appears that discovery was well underway for several months.

called for premature expert discovery and rejecting idea that defendant should respond with information it presently possessed because it could supplement later; defendant could respond after it served its expert disclosures).

For example, Interrogatory No. 2 asks Plaintiffs to identify, for each purchased product, the amount of heavy metals that they contend is unsafe or harmful. Plaintiffs objected on the grounds that the interrogatory calls for premature expert disclosure. Plaintiffs also raised this objection with regards to Interrogatory Nos. 3, 6, 7, 8 and 9.[9]   Gerber contends that these Interrogatories do not seek expert opinion at all.  Mot. at 13, 15.  Gerber is wrong.

With regard to what is a safe amount of heavy metals, Gerber argues in its motion to dismiss that whether any particular level of heavy metals is safe will require expertise in things like nutrition and toxicology. *See* ECF No. 133 at 1-2. This argument contradicts its position in its motion to compel. Since Plaintiffs, as lay witnesses, do not have scientific, technical, or specialized knowledge, they cannot opine on such matters. *See* Fed. R. Evid. 701(c). Thus, Gerber is prematurely asking for Plaintiffs' expert analysis in violation of Fed. R. Civ. P. 26, and therefore this interrogatory is improper at this stage and Plaintiffs should not be required to respond until after they serve their expert reports.

Interrogatory Nos. 6-8, apart from being objectionable because they are contention interrogatories, also prematurely seek expert analysis. These interrogatories all relate to Plaintiffs' allegations that Gerber's labeling and packaging was false and misleading due to the omission of material facts. Whether alleged omissions are material and are likely to mislead reasonable consumers is often the subject of expert analysis. *See, e.g., Krommenhock v. Post Foods, LLC,* 334 F.R.D. 552, 579-80 (N.D. Cal. 2020) (expert testimony used to support meaning and materiality

---

[9] Plaintiffs did not assert an expert-related objection to Interrogatory No. 4.

of representations); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.,* 326 F.R.D. 592, 601-03 (N.D. Cal. 2018) (finding expert testimony on materiality and meaning of challenged statements admissible).

Gerber also argues, particularly as to Interrogatory Nos. 2, 3 and 8, that it "only asks Plaintiffs identify such facts on which they base these allegations *presently known to Plaintiffs at this stage of the litigation*." Mot. at 14 (emphasis in original). Again, Plaintiffs are lay persons and cannot testify as to scientific or technical matters. Fed. R. Evid. 701. In any event, this concept was rejected in *McKellips* and should also be rejected here. Plaintiffs have responded to all the interrogatories to whatever extent possible that did not require expert opinion or was not a premature contention interrogatory (*see supra*).[10]

Defendant's cases do not compel a different conclusion. In *Tucker v. Momentive Performance Materials USA, Inc.*, No. 2:13-cv-04480, 2016 WL 8252929, at *4-5 (S.D. W. Va. Nov. 23, 2016), the interrogatories at issue did not require scientific, technical, or other specialized knowledge to respond. Rather, the interrogatories simply asked for the underlying facts supporting the plaintiff's allegations that the work environment was unsafe. *Id.* More importantly, the requested information (relevant to the issues of defense and indemnification) was not within the defendant's control. In contrast here, Gerber has a significant amount of information within its control. Similarly, in *Wagner v. St. Paul Fire & Marine Ins. Co.*, 238 F.R.D. 418 (N.D.W. Va. 2006), the interrogatories did not require scientific, technical, or other specialized knowledge to

---

[10] While Gerber suggested in the meet and confer process that Plaintiffs should simply read all the interrogatories as omitting any expert analysis and tried to rewrite the interrogatories in its letters to try to correct the fact that the interrogatories plainly sought expert opinion, *see, e.g.*, July 27 letter (ECF No. 150-20, Ex. 20), as Plaintiffs explained in response, it is improper for Defendant to essentially issue new interrogatories in a subsequent letter. *See* Aug. 3 letter (ECF No. 150-21, Ex. 21).

respond; rather, the interrogatories merely requested that the plaintiffs identify the wrongful acts that the plaintiffs alleged constituted legal malpractice. *Id.* at 420.

Gerber also contends that Plaintiffs failed to fully respond to Interrogatory No. 9, requesting that Plaintiffs "state the price they would pay for each of the purchased products, knowing what they knows [sic] today." Mot. at 16.  Gerber acknowledges that Plaintiffs answered the interrogatory stating that they "would not have bought any of the Baby Food Products" knowing what they know today, which essentially means they would have paid $0.  *Id.*  However, Gerber wants more and argues that this response is incomplete. It is not. Plaintiffs have also objected to the interrogatory to the extent Gerber is trying to ascertain through this interrogatory the amount of the overpayment or price premium Plaintiffs paid in this case. The amount of the overpayment or price premium is another subject of expert testimony and therefore Interrogatory No. 9 is also objectionable on this ground.[11]

> **B.** **Plaintiffs Should not be Compelled to Respond to Discovery Seeking Irrelevant Matter and Matter that is Disproportionate to the Needs of the Case.**
>
> **1.** **Discovery regarding the medical conditions of Plaintiffs' children (Interrogatory No. 14).**

---

[11]Gerber has failed to cite to any cases showing that the plaintiff's lay views regarding the appropriate price of a food product in the abstract are relevant to the determination of damages. Apparently realizing the validity of this objection, Gerber wrote in its July 27 letter to Plaintiffs that "this interrogatory should be construed as narrowed to *omit such expert opinions*.  Rather, Gerber asks Plaintiffs to specify whether they 'would not have bought' Gerber's products because they believe (i) the products are worth $0 or 'worthless' as alleged in the Complaint, or (ii) the products had some value to the responding Plaintiff, but not the full value of the price paid." July 27 letter at 6 (ECF No. 150-21, Ex. 20) (emphasis in original).  But as Plaintiffs explained in their August 3 letter, Plaintiffs responded fully to this interrogatory other than to the extent that expert testimony is required, which will be dealt with at the expert phase.  ECF No. 150-21, Ex. 21 at 3. Gerber's rewriting of the interrogatory in its July 27 letter to suggest an entirely new interrogatory is improper, particularly given that it has already exceeded the limit set by the Court.

Discovery is not unlimited and must be relevant to the parties' claims and defenses and proportional to the needs of the case. *See Does v. Cabell Cty. Bd. of Educ.*, No. 3:21-cv-00031, 2022 WL 288193, at *3 (S.D. W.Va. Jan. 31, 2022) (explaining that with the 2015 amendments of Rule 26(b)(1), the question is no longer whether "the discovery sought is 'reasonably calculated to lead to the discovery of admissible evidence'" but whether it is relevant to the parties' claims and defenses and proportional to the needs of the case). In response to Interrogatory No. 14, Gerber wants Plaintiffs to identify "all harm," including whether they have any of several medical conditions (loss of intellectual capacity, behavioral disorders, respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological or immunological damage, cancer, diabetes, or other disease or condition) that they contend their children have suffered from consuming the Gerber products they bought.

To respond to Gerber's interrogatory, Plaintiffs would have to have their children examined for the above medical conditions and then have experts analyze those results and opine on whether the medical conditions are the result of eating Gerber's baby foods. The Court should deny Gerber's motion to compel a response to this interrogatory because unlike in the personal injury actions against Gerber that are pending in other courts, Plaintiffs here do not allege physical harm to their own children as a result of eating the Gerber baby foods, and Gerber has failed to cite to any such allegations. Rather, Plaintiffs allege claims for false advertising, omissions, and economic loss. *See, e.g.*, ¶¶ 11, 84, 87, 90, 93.  Thus, the information sought is simply not relevant to the parties' claims and defenses. *See, e.g., Yamagata v. Reckitt Benckiser LLC,* No. 17-cv-03529-VC (RMI), 2018 WL 3155772, at *1-3 (N.D. Cal. June 28, 2018) (in false advertising case, finding that "Plaintiffs' privacy rights in their medical records have not been waived because Plaintiffs have not placed their medical conditions at issue"); *Mullins v. Premier Nutrition Corp.*,

No. 13-cv-01271-RS, 2016 WL 1535057, at *3 (N.D. Cal. Apr. 15, 2016) (explaining that the claims in this case "do not rise or fall on whether individual consumers experienced health benefits, due to the placebo effect or otherwise. They rise or fall on whether [Premier's] representations were deceptive") (quotations omitted). Nor would a response be proportional to the needs of the case.

While Plaintiffs cite several scientific studies and the findings of the Congressional Report explaining that exposing babies and children to heavy metals is detrimental to their healthy and development, such allegations do not give Gerber the license to conduct a fishing expedition into Plaintiffs' children's medical history, in light of the claims and defenses. Plaintiffs' allegations may be proven or disproven based on expert testimony, not based on any specific medical conditions that Plaintiffs' children may have. Such medical information is also protected by federal law (HIPPA Privacy Rule, 45 C.F.R. 160 and 164 subparts A and E) and Gerber's attempts to obtain such information is simply a means to harass the Plaintiffs and possibly force them to withdraw from the lawsuit.

Defendant argues that Plaintiffs should be required to produce such information because Plaintiffs have requested that Gerber perform ESI searches such as "ADHD" and "autism." Mot. at 10. However, as Plaintiffs explained during meet and confers and in the parties' correspondence, inquiries as to Gerber's knowledge regarding potential harms caused by Heavy Metals given its claimed expertise in children's health and nutrition (addressed extensively in the Congressional Subcommittee Report), relates to the materiality of the alleged omissions and is not the same as inquiries into any medical conditions of Plaintiffs' children, which are not at issue here.[12] Notably,

---

[12] While Plaintiffs also asserted an objection on the basis that Interrogatory No. 14 is a premature contention interrogatory, given that Plaintiffs' objections on the grounds of relevance and the

Gerber has failed to cite to any cases allowing intrusive discovery into medical conditions in a false advertising and omissions case.

### 2. Discovery regarding Plaintiffs' consideration and purchases of non-Gerber foods.

Gerber seeks broad and wide-ranging information relating to non-Gerber baby food products. *See* Interrogatory No. 10 (seeking that Plaintiffs identify other baby food products they "purchased, or considered purchasing" when they were purchasing the Gerber products, and the dates, location, and prices thereof); part of Interrogatory No. 17 (seeking that Plaintiffs identify baby food products they purchased since learning that Gerber's products contain or are at material risk of containing Heavy Metals, including the manufacturer, product name and variety/flavor). Similarly, Defendant seeks documents to the same effect. *See* RFP No. 7 (seeking all documents and communications identifying the foods and beverages "purchased and/or served," including receipts, loyalty card data, proofs of purchase, meal plans, photographs, or notes). To provide the requested information, Plaintiffs would need to scour their entire homes and computers to search through seven years of paper and Internet receipts, shopping lists, loyalty card documentation, emails, and photos to find any evidence of what they purchased or even considered purchasing (which in and of itself is too speculative to respond to).

Gerber contends that it is entitled to this discovery because: Plaintiffs "put these products at issue" in the Complaint, including by seeming to base their overpayment theory on competitor comparisons; and in the interrogatory responses where Plaintiffs state they "would not have bought any of the Baby Food Products" if they "had known that the Gerber Baby Food Products contain or were at material risk of containing harmful Heavy Metals." Mot. at 17 (citing ¶¶ 11, 135-137,

---

confidential nature of their children's medical history are strong, Plaintiffs withdraw their objection that Interrogatory No. 14 is a contention interrogatory.

205, 253).  Defendant is incorrect. The only factual allegations in the Complaint about alternative

baby foods are in Paragraphs 135-137, where Plaintiffs allege that there are baby food products

available with little to no detectable levels of heavy metals.  Plaintiffs identify the manufacturers

as Nature's One, Cerebelly, Bobbie, Else Nutrition, and Once Upon a Farm, which have been

recognized by the non-profit Clean Label Project. These allegations, however, simply do not allow

Gerber to conduct a fishing expedition into Plaintiffs' shopping habits of all other non-Gerber baby

foods, including what they considered buying, over the last seven years.

For example, in *In re Coca-Cola Products. Mktg. & Sales Practices Litig. (No. II)*, No. 14-

md-02555-JSW (MEJ) 2015 WL 5043846 (N.D. Cal. Aug. 26, 2015), the court denied the

defendant's motion to compel written discovery regarding the plaintiffs' purchasing habits,

including receipts for non-Coca-Cola foods and beverages, and reward club information. *Id.*, 2015

WL 5043846 at *4–5.[13] The court found that even if the information was relevant (which it was

not), it was not proportional to the needs of the case and there were less burdensome means of

discovering the same basic information, *i.e.*, via a deposition.  *Id.*  The *Coca-Cola* court cited

*Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) in rejecting the defendants' attempt to

obtain broad and wide-ranging discovery from the plaintiffs regarding their "general food

purchasing habits," including other brands.  Regarding *Astiana v. Kashi,* the *Coca-Cola* court

noted that "the fact that Plaintiffs may also purchase unhealthy or otherwise artificial foods says

nothing about whether they purchased Kashi products specifically because they were supposedly

healthy and natural." *In re Coca-Cola,* 2015 WL 5043846, at *4 (citing *Kashi*, 291 F.R.D. at 503).

While the defendants in *Coca-Cola* tried to distinguish *Kashi* on the ground that it related to

---

[13] That the defendant in *Coca-Cola* argued that the discovery was relevant to reliance while
Gerber here claims it is relevant to damages is a distinction without a difference. *See In re Coca-Cola,* 2015 WL 5043846 at *4–5.

typicality, the court disagreed, stating, "While Defendants are correct that *Kashi* considered typicality issues, it is not clear how that distinction matters to this inquiry." *Id.*

The same holds true here: the fact that Plaintiffs may also have purchased other brands of baby foods says nothing about their purchases of Gerber products and is not relevant to whether Gerber omitted material facts from its packaging regarding Heavy Metals. Moreover, irrespective of the relevancy issue, the discovery Gerber seeks is not proportional because it would be less burdensome for them to "question Plaintiffs about these issues at their depositions." *In re Coca-Cola.*, 2015 WL 5043846, at *4-5. It makes no sense and is disproportional to the needs of the case to require Plaintiffs, parents who are busy trying to raise their children, to search hard-copy records, emails, and photos for the past seven years.[14]

Notably, as Gerber admitted in its July 27 letter, Plaintiffs did respond to two other interrogatories (Nos. 18 and 19) that speak to their general purchasing habits. Interrogatory No. 18 asked Plaintiffs to identify all other foods and beverages they purchased and/or served to babies, toddlers, or children since first learning of the Heavy Metals in Gerber products; Interrogatory 19 asked Plaintiffs to identify any instances they served babies, toddlers or children sweet potato, carrot, rice or rice-based foods, and apple and/or grape juice since first learning of the Heavy Metals in Gerber products. Plaintiffs provided the requested information in an effort to avoid a discovery dispute, however, Plaintiffs should not be compelled to search for and produce the far-

---

[14] Gerber's attempt to distinguish *Coca-Cola* and *Kashi* (Mot. at 18 n.2) fails. Gerber argues that the cases are inapplicable because the plaintiffs in those cases only argued that the products were "'unhealthy' because they include artificial or non-natural ingredients, not that the products were 'unsafe' and/or 'harmful' to consume as Plaintiffs allege here" and that Plaintiffs here "presumably would not purchase any foods or beverages that they deem as 'unsafe' and/or 'harmful' for a child to consume" while consumers may still eat other "unhealthy" foods. *Id.* This attempted distinction between "unhealthy" and "unsafe and/or harmful" is refuted by the language in these cases cited above, holding that the purchase of other brands of the food at issue does not bear on whether this defendant committed an actionable deception.

reaching and disproportional additional discovery regarding products purchased from Gerber's competitors that it seeks. Moreover, during their search for Gerber product receipts, to the extent these receipts also showed the purchase of non-Gerber products, which some did, Plaintiffs produced them, contrary to Gerber's representations otherwise. But requiring more is disproportional to the needs of the case and unduly burdensome.

Gerber's reliance on *In re Peanut Farmers Antitrust Litig.*, No. 2:19cv00463, 2020 WL 9216019, at *1-2 (E.D. Va. July 24, 2020) (quoting *Contract Materials Processing, Inc. v Kataleuna Gmbh Catalysts*, 462 Fed. Appx. 266, 273) (4th Cir. 2012)), is misplaced. In that antitrust case, the plaintiffs sought data related to their proposed damage model that they claimed would allow them to identify a benchmark for comparing the prices of the product at issue. According to the court, the defendant failed to *argue* that producing the data would be burdensome and since the plaintiffs showed their proposed analysis is a widely accepted methodology for computing damages in an antitrust case, the court granted the motion to compel. In contrast here, discovery is in its early stages, and Plaintiffs have not proposed any damages model in their Complaint or otherwise that Gerber can claim Plaintiffs' individual purchasing habits are relevant to. In fact, Gerber has failed to cite any cases showing that purchasing habits and related documents are relevant to any potential damages models that have been accepted in cases such as this one. Moreover, Plaintiffs have shown that the discovery requests are disproportional to the needs of the case. Accordingly, Gerber's motion to compel should be denied.

### C.      It is Proper for Plaintiffs to Respond to Discovery Subject to their Objections.

Fed. R. Civ. P. 33(b)(3) allows a party to both object and respond to an interrogatory. *See* Fed. R. Civ. P. 33(b)(3)*; Norton v. Knapheide Equip. Co.,* No. 4:18-cv-01615-SNLJ, 2019 WL 3082631, at *1 (E.D. Mo. July 15, 2019) (rejecting argument that answering interrogatories subject

to objections was improper); *Whitley v. McClain,* No. 4:13-CV-994 (CEJ), 2014 WL 1400178, at *1 (E.D. Mo. April 10, 2014) (same).   Here, Plaintiffs did just that and although they are not withholding any information, their objections nevertheless still stand.

Many of Gerber's interrogatories are vague, ambiguous, and overbroad (Interrogatory Nos. 18, 19, 20). For example, Interrogatory No. 18 asked Plaintiffs to identify "all other foods and beverages" they bought and fed their children since learning that Gerber products contain, or are at material risk, of containing heavy metal (or over the last year and a half). Plaintiffs provided the requested information to the best of their ability. But if Plaintiffs recall at their deposition another food item not mentioned in the response, Plaintiffs want to avoid being accused of bad faith or of not being completely truthful. Thus, Plaintiffs' objections still have merit and still stand.  *See, e.g., Whitley*, at *2 (sustaining objection to interrogatory on grounds of vagueness although defendant provided a response). And Plaintiffs similarly answered subject to not providing attorney-client materials or work-product to the extent implicated, which is also a proper objection on which to stand. *Id.* at *2.

Neither of the cases Gerber cites addresses Rule 33(b)(3), which, again, allows a party to both object and respond.  *See* Mot. at 19-20.  Accordingly, these cases are not dispositive on this issue. *See Norton*, 2019 WL 3082631, at *1 ("Having failed to address Rule 33(b)(3) or these supportive cases, this point will also be denied."). If Gerber believes that any of the objections that Plaintiffs are standing on are improper, it should have argued the merits of those objections in its opening brief. *See Whitley,* 2014 WL 1400178, at *2-3. Gerber did not and therefore it waived such arguments.

## II.   **GERBER VIOLATED CMO NO. 2 BY SERVING 220 INTERROGATORIES**

As noted by Gerber, it served 20 interrogatories and 16 document requests on each Plaintiff.  *See* Mot. at 3.  Plaintiffs asserted an objection in their interrogatory responses that the

total of 220 interrogatories violated the Court's limit set in CMO No. 2.  *See id.* at 3 n.1.  CMO

No. 2 provided in pertinent part that "defendant … may not serve on plaintiffs, *collectively*, more

than fifty (50) interrogatories, including subparts, without leave of court."  *See* CMO No. 2 at 2

(emphasis added).  Gerber did not seek leave of Court to serve more than the collective (50)

interrogatories provided by the Court.

      While Plaintiffs did not refuse to respond to any interrogatories on this basis so as not to

delay the litigation, given the instant Motion, Plaintiffs now seek clarification of the limit on the

number of interrogatories that Gerber may serve.  Plaintiffs read the word "collectively" in CMO

No. 2 to mean the limit is a total of 50 interrogatories for all Plaintiffs.  Defendant appears to have

read the word "collectively" to mean 50 interrogatories for each Plaintiff (well in excess of the 25

limit set by Fed. R. Civ. P. 33), allowing them a total of 550 interrogatories.  Presumably, if the

Court granted Defendant 550 interrogatories, Plaintiffs would be entitled to that same amount.

      However, Defendant's reading of the word "collectively" is contrary to its plain meaning,

which is "as a group."[15]  *See Makaeff v. Trump University, LLC*, Civ. No. 10-CV-0940-GPC

(WVG), 2014 WL 3490356, at * 6 (S.D. Cal. July 11, 2014) ("It appears that the Court considered

Plaintiffs' request to collectively serve 75 ROGs, and instead allowed Plaintiffs and Defendants to

serve a collective total of 50 ROGs per side. 'Collective' is defined as: of, relating to, or being a

group of individuals; shared or assumed by all members of the group. [footnote omitted].

Therefore, it is clear to the Court that Plaintiffs were allotted a combined or collective total of 50

ROGs, and that, contrary to Plaintiffs' argument, the Court did not allow each Plaintiff to serve 50

ROGs. The Court acknowledges that the language in its Scheduling Orders is confusing when read

---

[15]https://dictionary.cambridge.org/us/dictionary/english/collectively (last accessed Aug. 14,
2022).

independently, but when read with the Joint Discovery Plan, it is clear that Plaintiffs are limited to a total of 50 ROGs collectively").

Moreover, Defendant's reading of the word "collectively" is contrary to its use of the same word by the Court in the sentence prior to the one limiting Defendant's interrogatories, in which the Court limited Plaintiffs' discovery.  The Court stated, "plaintiffs, *collectively*, may not exceed ten (10) non-party, non-expert witness depositions in total per side and may not serve on defendant more than fifty (50) interrogatories, including parts and subparts, in total without leave of court." CMO No. 2 at 1-2 (emphasis added).  If Defendant were correct in its reading of the word "collectively," then CMO No. 2 would have granted *each* Plaintiff ten non-party, non-expert witness depositions (for a total of 110) and *each* Plaintiff 50 interrogatories to serve on Defendant for a total of 550 interrogatories.  Neither party read the word "collectively" in that prior sentence to mean "per Plaintiff" and it should not be read that way in the following sentence.  In fact, the language in the prior sentence made clear that the word "collectively" means "in total per side" which is consistent with its common meaning as stated above.

If Plaintiffs are correct in their interpretation of the word "collectively," and since they have already responded to well over 50 total interrogatories, Gerber's motion to compel responses to Interrogatory Nos. 2, 3, 4, 6, 7, 8, 9, 10, 14 and part of 17 should be denied on this basis alone. *See Safeco of America v. Rawstron,* 181 F.R.D. 441, 448 (S.D. Cal. 1998) ("Since the interrogatories were objectionable, both because they violated the numerical limit contained in Rule 33(a) and because they were unduly burdensome and oppressive, the Court has no occasion to consider the adequacy of plaintiff's responses").

**III.**    **COSTS AND ATTORNEYS' FEES ARE NOT WARRANTED HERE**

Defendant states in its Conclusion (Mot. at 25) that it should be awarded reasonable attorneys' fees and costs incurred in filing this Motion under Fed. R. Civ. P. 37(a)(5). Gerber has a misunderstanding of Rule 37.  First, Gerber must prevail on the motion to be eligible for attorneys' fees and costs. As Plaintiffs have shown above, their objections and positions are well-supported by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and applicable case law. Second, even if Gerber prevailed on any one of the discovery disputes, Plaintiffs' opposition to Gerber's motion to compel was substantially justified.  *See* Fed. R. Civ. P. 37(a)(5)(A)(ii) (court may deny sanctions if opposition was substantially justified).  "A motion is 'substantially justified' if it raises an issue about which 'there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'" *Doe v. Lexington-Fayette Urb. Cnty. Gov't*, 407 F.3d 755, 765 (6th Cir. 2005) (citing *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citations and quotation marks omitted)). As the Supreme Court has noted, "the one [connotation] most naturally conveyed by the phrase before us here ["substantially justified"] is not 'justified to a high degree,' but rather 'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person."  *Pierce v. Underwood*, 487 U.S. at 565. Plaintiffs' positions here meet the substantially justified standard.

**CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that the Court deny Gerber's motion to compel in full.

Dated: August 19, 2022

                                                    Respectfully submitted,
                                                    By: */s/ Steven J. Toll*
                                                    Steven J. Toll
                                                    **COHEN MILSTEIN SELLERS**

**& TOLL PLLC**
1100 New York Ave. NW
5th Floor
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699


Rosemary M. Rivas
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: 510-350-9700
Facsimile: 510-350-9701


Janine Pollack
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th
Floor
New York, New York 10036
Telephone: 212-899-1765
Facsimile: 332-206-2073

*Plaintiffs' Interim Co-Lead Counsel*